IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Crim. No. ELH-19-00160 |
| DEMETRIOS STAVRAKIS, | |
| a/k/a Dimitrios Stavrakis, a/k/a Jimmy | |
| *Defendant*. | |

## MEMORANDUM

This case is rooted in an arson that occurred in the early morning hours of July 29, 2015, at a two-story property located at 234 South Haven Street in Baltimore, Maryland. The structure houses Adcor Industries, Inc. ("Adcor"), a company that was solely owned by the defendant, Demetrios Stavrakis. Adcor manufactures parts for beverage and aerospace companies, the defense industry, and the military. At the relevant time, Adcor was also a federal firearms licensee. In addition to Adcor, the building houses related business entities owned by the defendant. I shall refer to these entities collectively as "Adcor."[1] The building itself is owned by TJ Enterprises, LLC, which is also owned by the defendant.

In an Indictment filed March 28, 2019 (ECF 1), Mr. Stavrakis was charged with four federal offenses. The Second Superseding Indictment, filed on June 6, 2019 (ECF 94), is the operative charging instrument. In particular, the defendant was charged in Count One, under 18 U.S.C. § 844(h)(1), with use of fire to commit a federal felony, *i.e.*, wire fraud, as charged in Counts Two

---

[1] At trial, Michael Young, a certified public accountant and partner at a public accounting firm, testified that Adcor has been a client of the accounting firm since 2006. He explained that the defendant owned 100% of Adcor. And, Adcor owned 100% of three other businesses and had a 50% ownership of another.

and Three. He was also charged with aiding and abetting under 18 U.S.C. § 2. Counts Two and Three charged wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and Count Four charged malicious destruction of real property by fire, in violation of 18 U.S.C. §§ 844(i) and 2.

The defendant proceeded to a jury trial that began on September 9, 2019. ECF 149. It concluded on October 24, 2019, when the jury returned a verdict of guilty on all charges. ECF 216; ECF 226 (Verdict).

From its inception, the case was hotly contested. The parties filed numerous pretrial motions, and they also filed a stream of motions throughout the trial. During the trial, which consumed approximately seven weeks, the government called about 50 witnesses; ten witnesses testified during the defendant's case; and three witnesses testified during the government's rebuttal case. About 700 exhibits were introduced into evidence.

The fact that the fire was an arson was not in dispute. However, no evidence was adduced to establish that the defendant was the torch. Rather, the government's theory was that the defendant was involved as an aider and abettor, and that he was a knowing and willful participant. He collected around $15 million in insurance proceeds.

The government's case was largely circumstantial. At the conclusion of the government's case-in-chief, Mr. Stavrakis moved for judgment of acquittal, pursuant to Fed. R. Crim. P. 29. ECF 206. The Court reserved ruling. The defense renewed its motion orally at the close of the defense case. Again, the Court reserved.

Now pending is defendant's renewed motion under Fed. R. Crim. P. 29, combined with a motion for new trial under Rule 33. ECF 229 (the "Motion"). According to the defense, the government failed to produce sufficient evidence from which a reasonable jury could convict the defendant of any of the charges. ECF 229 at 2. As to Counts One, Two, and Four, the defense

asserts, *inter alia*, that the government failed to prove, beyond a reasonable doubt, that the defendant knowingly and intentionally participated in the fire. As to Count Three, the defense contends, among other things, that the government failed to present evidence to support a finding, beyond a reasonable doubt, that the defendant knowingly caused interstate wires to be used to transmit a fraudulent insurance claim with respect to Adcor's security and surveillance system. *Id.* at 14.

With regard to the motion for new trial under Rule 33, the defense maintains that the verdict was against the weight of the evidence; the Court erred in providing a willful blindness instruction to the jury; the government knowingly presented false evidence to the jury through the testimony of Albert "Trey" Radtke; the government failed to correct the record when now-retired Baltimore City Detective Michael Reno testified concerning his suspension without pay from the Baltimore City Police Department; and, during closing argument, the government argued facts not in evidence. ECF 229 at 20-21. The government opposes the motion. ECF 232. The defense has replied. ECF 233.

Oral argument was heard on January 24, 2019. ECF 241. At argument, the defendant maintained, among other things, that the jury was "seduced by suspicion," not evidence, and drew inferences beyond the bounds of reason. In the defendant's view, the jury simply "got it wrong."

## I.  The Legal Standards

Under the Constitution, an accused is protected from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also United States v. Gaudin*, 515 U.S. 506, 522 (1995). Rule 29 of the Federal Rules of Criminal Procedure, which governs a motion for acquittal, helps

to ensure this protection. It requires that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

When, as here, the defense moved for judgment of acquittal at the close of the government's case, and the court reserved ruling, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).[2] Nevertheless, "[a] defendant who brings a sufficiency challenge bears a heavy burden . . . ." *United States v. Clarke*, 842 F.3d 288, 297 (4th Cir. 2016); *see United States v. Palomino-Coronado*, 805 F.3d 127, 130 (4th Cir. 2015).

As the Supreme Court has explained, the court must review the evidence in the light most favorable to the government. And, the court must determine whether "*any* factual trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997).[3]

Ultimately, the jury verdict should not be disturbed "if there is substantial evidence, viewed in the light most favorable to the Government, to support it." *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018) (citation omitted); *see United States v. Bailey*, 819 F.3d 92, 95 (4th Cir. 2016). "Substantial evidence" is defined as evidence that "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable

---

[2] At oral argument on the Motion, the government suggested that the Court should consider the entire record in ruling on the Motion. However, defense counsel did not signify agreement with that suggestion.

[3] The elements for each offense were carefully explained to the jury during jury instructions. Therefore, I need not restate them here. I have, of course, considered the elements in connection with assessing the sufficiency of the evidence.

doubt." *Burfoot*, 899 F.3d at 334 (citation omitted); *see United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 238 (2018).

A jury may consider circumstantial evidence. The jury may also draw reasonable inferences from such evidence. *See*, *e.g.*, *United States v. Bates*, 784 F. App'x 312, 326 (6th Cir. 2019). Indeed, "circumstantial evidence 'is treated no differently than direct evidence, and may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence.'" *United States v. Rafiekian*, 18-cr-457-AJT, 2019 WL 4647254, at *9 (E.D. Va. Sept. 24, 2019) (Trenga, J.) (quoting *United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir. 1989)).

To be sure, it is difficult to prove intent with direct evidence. But, "'[i]ntent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits.'" *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (citation omitted).

Critically, the evidence must be considered "in its totality . . . ." *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008). Evidence is not insufficient merely because it is "susceptible to alternative interpretations . . . ." *Id.* And, "where the evidence supports differing and reasonable interpretations," it is for the jury to decide "which interpretation to accept." *United States v. Moye*, 454 F.3d 290, 394 (4th Cir. 2006) (en banc).

Moreover, a court may not grant a judgment of acquittal based only on a challenge to the credibility of a witness. To the contrary, "determinations of credibility and resolutions of conflicts in the evidence . . . are within the sole province of the jury and are not susceptible to judicial review." *United States v. Louthian*, 756 F.3d 295, 303 (4th Cir. 2014) (citation and internal quotation marks omitted).

Rule 33(a) of the Federal Rules of Criminal Procedure governs the motion for new trial. It states, in part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

In considering a Rule 33 motion, a court "is not required to view the evidence in the light most favorable to the government, and it may evaluate the credibility of witnesses." *United States v. Saint Louis*, 889 F.3d 145, 157 (4th Cir. 2018). However, "[s]uch motions are disfavored, and are to be granted only when the evidence weighs heavily against the verdict." *United States v. Chavez*, 894 F.3d 593, 607 (4th Cir. 2018) (citation and internal quotation marks omitted); *see also Burfoot*, 899 F.3d at 340 (noting that it "is the rare circumstance" for evidence to weigh lays heavily against the verdict); *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003).

Indeed, a court must "exercise its discretion to grant a new trial 'sparingly.'" *Wilson*, 118 F.3d at 237. And, mere "disagreement with the jury's verdict [does] not mandate a new trial." *Chavez*, 894 F.3d at 608 (internal quotation marks omitted) (citation omitted); *see also United States v. Garcia*, 855 F.3d 615, 620 (4th Cir. 2017) (stating that "the district court should only overturn a jury verdict in the 'rare circumstance' when a verdict is against the weight of the evidence") (quoting *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006)).

## II.     Factual Summary[4]

Adcor fronts on South Haven Street in Baltimore, and is bordered, in part, by Gough and Grundy Streets. It contains a secured area within the building, known as the Gun Room. The

---

[4] At this juncture, I do not have the benefit of a complete trial transcript, although I have a handful of excerpts from the trial. In presenting the factual summary, I have relied primarily on my notes from the trial as well as the parties' submissions.

As compared to the volume of evidence presented at trial, the Factual Summary is obviously skeletal. To the extent that I have quoted testimony or argument obtained from my notes, I do not represent that the quotations are precisely accurate.

building includes a large machine shop and warehouse, with several bay doors for trucks. Within the warehouse is an enclosed office known as the DNC Hut.

Special Agent Lisa Herb of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") explained that The National Fire Protection Association ("NFPA") lists four classifications of fire: accidental (*e.g.*, pot on stove); natural (*e.g.*, lightening); undetermined; and incendiary, *i.e.*, arson. As to arson, the NFPA identifies six motives: vandalism, excitement, crime concealment, revenge, profit, and extremism. It is undisputed that the fire at Adcor was classified as incendiary. However, motive was an issue.

Jose Romero was on Grundy Street in the early morning of July 29, 2015. He saw smoke coming from the building at approximately 1:30 a.m. and called 911. The Baltimore City Fire Department promptly responded, and the fire was extinguished by approximately 1:50 a.m. No one was injured.

The fire originated in the DNC Hut. It measures approximately ten feet by twelve feet in size. Little of value was stored in the DNC Hut after the fire. After the fire, a five gallon can of methanol, in charred condition, was found in the DNC Hut. It was undisputed that the methanol was used to ignite the fire. Prior to the fire, that can of methanol had been stored in the beverage shipping area of the Adcor warehouse. Notably, it was used on a limited basis by shop foreman William "Bud" Kuhrmann. It was the only can of methanol stored at Adcor.

There was no sign of forced entry into the Adcor building. Nor was anything of value taken from the premises at the time of the fire. Although the fire was contained to the DNC Hut, other parts of the premises experienced smoke and water damage. As a result of the damages, Adcor's insurer, Travelers Indemnity Company of America ("Travelers"), paid out over $15 million on the claim.

The government spent considerable time in adducing evidence concerning the way in which Adcor employees generally gained access to the building, as well as the company procedures for opening and closing the building. It also spent significant time reviewing Adcor's security and surveillance systems at the time of the fire.

There are two glass doors at the front or main entrance to Adcor. All Adcor employees were provided with a Brivo security card that operated a magnetized lock on the front door, located below a deadbolt lock. Each card was linked to a unique number assigned to that employee. An Adcor employee could swipe his or her security card to unlock the front door with the Brivo card. If the swipe card was used to enter the building, a record was made that reflected the identity of the person who swiped in with the Brivo card, as well as the date and time of use of the Brivo card.

The front door could also be opened with a key to the deadbolt lock, which was located towards the top of the door. But, only select employees had a key. The defendant, as the CEO of Adcor, was one of them.

The front doors were also equipped with a security alarm, for which an alarm keypad was situated nearby. That keypad was one of three for the entire building, a large structure bordered by several City streets. The keypad is used to arm and disarm the alarm by way of a four digit code. An entrant has a 30-second grace period to disarm the system.

In July 2015, the employees who knew the alarm code all shared the same alarm code. The defendant knew the alarm code. Each user of the alarm code was identified as "User 3" in the alarm records. The areas of the building covered by the alarm were designated as "partitions." The front lobby area, adjacent to the glass doors, was called Partition One. The warehouse was designated as Partition Two.

Betsy Robak joined Adcor in May 2009. She worked in accounting. On July 28, 2015, Robak left the building at 5:51:08 p.m. She was the last office employee to leave Adcor, other than the defendant. On that day, Mr. Stavrakis had asked Robak to join him for dinner at the Blue Hill Tavern, a restaurant in Baltimore that he co-owned. Although Ms. Robak had worked at Adcor since 2009, the two had never had dinner alone until that night. She had, however, previously been to the Blue Hill Tavern with the defendant as part of a group of Adcor employees.

At the time of the fire, Adcor had eleven security cameras. The government introduced video surveillance evidence obtained from Adcor security camera No. 1, which showed the defendant at Adcor's main entrance doors on July 28, 2015, about one minute after Robak left the building. In particular, the video showed the defendant putting tape on the latch of the front door before he set the security alarm.

At 5:52 p.m., after applying the tape, the defendant set the security alarm by using the alarm keypad near the front doors. He then exited the building through the main doors. However, he returned a few seconds later. He entered by pulling open the front door without swiping his Brivo security card. In other words, by taping the door, the defendant defeated a security feature that would have identified the person opening the door. He then turned off the security alarm. At 5:53 p.m., the defendant applied additional tape to the same area of the front door. Then, he activated the alarm for a second time, at 5:54 p.m., and left the building for the night.

Several Adcor witnesses testified that they were unfamiliar with any problem with Adcor's front entrance doors that would cause difficulty in being able to set the alarm. Others testified to the contrary. *See*, *e.g.*, ECF 232-1. But, there was no testimony at all concerning any prior use of tape to fix any issue with Adcor's front entrance doors.

According to the evidence, office personnel generally were not responsible for activating the alarm at the end of the work day. Rather, the nightshift supervisor was responsible for doing so. Therefore, when Mr. Stavrakis left the building on the evening of July 28, 2015, it was unusual that he activated the alarm. And, when the defendant left the Adcor premises on July 28, 2015, two machinists were on the shop floor. They were working the 3:00 p.m. to 11:00 p.m. shift.

Edward Thomas, one of those employees, had been asked to close up on the night of July 28, 2015. At about 5:00 p.m., he noticed the defendant looking out of an interior office window, which overlooked the shop area. At about 7:00 p.m., after the lights had been turned off in the office area, Thomas entered the lobby of the office area, near the front doors, with the intention of ensuring that the front doors were secured. To his surprise, he set off the motion detector that covered much of the lobby area.[5] The activation of the alarm was documented by records for the security system. Having set off the alarm, Thomas disarmed it at 7:02 p.m. To do so, he used the keypad near the front doors. He then rearmed the office, designated as Partition One. However, he did not arm the shop area, designated as Partition Two, until he and his coworker left the building for the night. They exited through a shop door. The system recorded their time of departure as 11:16 p.m. The building was then dark.

There is no record of the swipe card having been used to enter through the front doors of the Adcor building on the morning of July 29, 2015, prior to the fire. Nor was there any video surveillance footage of anyone entering the building through the front lobby doors prior to the fire. But, at 12:25 a.m. on that date, Partition One was disarmed. The shop floor, Partition Two, was disarmed several minutes later at 12:33 a.m.

---

[5] Due to a masking feature, Security Camera 1 did not capture the entire lobby area.

Anthony J. Cianferano, Jr., a Baltimore City Firefighter, was one of the first responders to arrive at the scene. He arrived at Adcor between 1:40 a.m. and 1:45 a.m. He testified that the lights were on in the hall/foyer as he approached the two front doors from the inside of the building.

The defendant was notified of the fire while he was at home. He arrived at Adcor just before 3:00 a.m. on July 29, 2015. His cell phone did not link him to the Adcor premises at the time of the fire.

After the defendant learned of the fire, one of the first calls he made, at approximately 4:11 a.m., was to Randolph ("Randy") Goodman, a public adjuster with whom the defendant was familiar.[6] Mr. Goodman is a principal with the firm Goodman-Gable-Gould/Adjusters International ("GGG"). According to the evidence, a public adjuster helps navigate the insurance claim process and assists an insured in maximizing the insured's recovery in accordance with the terms of the applicable insurance policy. As noted, Adcor was insured through Travelers.

Special Agent Herb was notified of the fire by Detective Michael Reno of the Baltimore City Police Department ("BCPD").[7] Reno arrived at Adcor at about 2:00 a.m. on July 29, 2015. Agent Herb arrived at Adcor at about 4:00 a.m. Among other things, she spoke with the defendant, who was already at the scene. In response to Herb's inquiry, the defendant identified two former, disgruntled employees, one of whom was Michael Brown.

The defendant did not disclose to Agent Herb that he had taped the front door that night because it was malfunctioning. Moreover, there was no evidence that anyone other than the

---

[6] The Court did not permit the government to introduce evidence of a fire in 2007 at another building associated with the defendant, for which a substantial insurance claim was paid, and for which Mr. Goodman assisted the defendant.

[7] Reno retired from the BCPD in June 2019, after 25 years of service with the BCPD.

defendant knew of the tape on the front door.  Yet, as of 4:39 a.m., there was no tape on Adcor's front entry door, as reflected in a photograph of the front door that Agent Herb took at that time.

Agent Herb asked Adcor senior employee Michael Hyatt to provide video surveillance for a 24-hour period surrounding the fire.  Hyatt began working at Adcor in 1997, at the age of 19.  By 2015, he held the position of Vice President and was regarded as a senior officer.  He was also in charge of "IT."  And, he is a close associate of the defendant.

On the afternoon of July 29, 2015, Hyatt furnished a disk with the video surveillance to law enforcement.  It covered the period from 4:00 a.m. on July 28, 2015, through 8:00 a.m. on July 29, 2015.  Agent Herb did not review the video at that time, however.  And, it was later determined that the disk did not contain footage of activity at the front doors or lobby between 12:25 a.m. and 12:33 a.m. on July 29, 2015.  There was also a gap in footage for Security Camera 1 from 6:00 p.m. on July 28, 2015, to 2:00 a.m. on July 29, 2015.  Thus, the video did not reflect employee Thomas setting off the alarm at about 7:00 p.m. on July 28, 2015.

A few days after the fire, Travelers requested the actual Hard Disk Drives.  But, Adcor was unable to produce the two Hard Disk Drives that stored the relevant video surveillance footage, as requested by Travelers.  According to Hyatt, on July 30, 2015, the server crashed, so he replaced the Hard Disk Drives and left the old ones on a table near the server, located in a second floor office.  They disappeared and were never found.

As of July 30, 2015, neither Travelers nor law enforcement had requested  production of the actual Hard Disk Drives.  It was not until a few days after the fire that Travelers asked Adcor for them.  By that time, they could not be located.  The cleaning and restoration crews working at Adcor denied disposing of any Adcor property.

The parties stipulated that Travelers recovered 10 Hard Disk Drives from an office area of Adcor on September 11, 2015.  They were "loose," that is, they were "not currently installed in any server or computer."  *See* Govt. Exhibit 120.

On Monday, August 3, 2015, while Hyatt was on vacation with his family at a beach in North Carolina, ATF Task Force Officer Hodges asked Hyatt for the Hard Disk Drives.  And, on August 6, 2015, TFO Hodges showed up at Hyatt's beach place, without having told Hyatt that he would do so.

ATF Specialist Steve Greene, a digital forensic analyst, was received as an expert.  He opined that if the Hard Disk Drives had been available for inspection, he would be able to determine if any files had been deleted.

James McKinnes, a Certified Fire Investigator and Special Agent with ATF, took numerous photographs at Adcor on April 3, 2019.  He also inspected the roof hatch, by gaining access to the roof through the kitchen on the second floor.  He noted there is no handle on the outside of the hatch, *i.e.*, on the roof side.

Eric Huzzy, an insurance restoration contractor, was at Adcor on several occasions, beginning soon after the fire.   He photographed the roof hatch, and also noted that the access handle is located on the interior of the hatch, inside the building.

Douglas Fisher, a Fire Protection Engineer with more than two decades of experience, visited Adcor on August 3, 2015, and again on August 28, 2015, on behalf of Travelers.  Among other things, he examined Adcor's security and surveillance systems.  The company did not have a fire suppression system.  By the time Fisher returned to Adcor in late August of 2015, Adcor's front doors had been replaced.  Moreover, those doors, which had supposedly malfunctioned on

July 28, 2015, had been discarded.  And, according to Fisher, only two of Adcor's eleven security cameras were damaged due to the fire.  *See* Government Exhibits FE 32 and FE 35.

Michael Brown joined Adcor in 2000.  Brown's wife, his father, and his two sons, also worked at Adcor at varying times.  They all left employment with Adcor on the same date in September 2013.  The departure was not amicable.

After the fire, the defendant implicated Brown by way of statements he made to Agent Herb and ATF Task Force Officer Dexter Hodges.  Similarly, Fisher attended an interview of the defendant on August 28, 2015, and noted that the defendant discussed Brown and his wife and referenced a disparaging matter involving Ms. Brown.  And, Goodman testified that the defendant told him that a disgruntled employee named Brown may have started the fire.

Mr. Brown and his wife both testified for the government.  Electronic evidence showed that Mr. Brown was at his home at the time of the fire.  And, Brown denied any wrongdoing.

According to Brown, he developed about 30 patents that are owned by Adcor.  Brown also explained that from approximately 2005 to 2010, Adcor made upper receivers for Colt's M-4 weapons.

Brown recounted that he had been close with the defendant for many years.  But, by the time of Brown's departure in 2013, his relationship with the defendant had deteriorated.  In fact, in 2014, the defendant sued Brown, claiming Brown misappropriated intellectual property that belonged to Adcor.  The case eventually settled.

Brown testified that at 2:19 a.m. on July 29, 2015, he learned of the fire from the police. He recalled that he went to the scene later in the day, because he and his family were going to dinner in that area for his son's birthday.  He also claimed that until September 2019, he was

unaware of any rumors concerning his wife's alleged indiscretion with an Adcor employee. It was one of the prosecutors who told him of the "rumor."

Brown was familiar with the roof hatch at Adcor. He maintained that it could not be opened from the outside.

The government devoted substantial time to the painstaking if not tedious presentation of voluminous evidence concerning the financial status of Adcor. The evidence pertained to the period beginning in 2010, when Adcor lost a lucrative contract with Colt Industries, through the time of the fire. The parties disagreed about the financial condition of Adcor and the interpretation of that evidence.

Although proof of motive does not establish guilt, it may be considered by a jury as bearing on intent. The evidence, in the light most favorable to the government, showed that in the years preceding the fire, and continuing through the time of the fire, Adcor's financial condition was dire. This constituted significant evidence of motive.

According to the government's evidence, consisting of records and the testimony of numerous witnesses, Adcor suffered total operating losses of over $7.6 million between 2011 and June 2015, and from January to June 2015, it had a six-month operating loss of $718,679.13. Moreover, Adcor was repeatedly in default as to various loans, necessitating forbearance agreements with several lenders at varying times, including M&T Bank; JOCO Financial, LLC; 1st Mariner Bank; and Bank of America. Adcor employees and suppliers testified that between 2012 and July 2015, Adcor also failed to make timely payments to several of its suppliers.

The defendant personally borrowed over $5 million, and used some of the money to repay loan obligations. To satisfy debt obligations, Adcor also sold its valuable Beverage Division,

which was profitable, to Adcor Packaging Group, of which the defendant owned only 50%. And, the evidence suggested serious concerns as to Adcor's viability.

As noted, two of Adcor's surveillance cameras had been damaged during the fire. Hyatt testified that the defendant asked him to obtain bids for Adcor's security system. Hyatt obtained a bid from Strat Security, which Hyatt described as "a little bit of an upgrade." The defendant personally met with Strat Security about the bid. Hyatt sent the bid from Strat Security to Goodman via email on September 14, 2015, and copied the defendant on the email. In the email, Hyatt asked "how to proceed." He testified that he was not aware that the bid he sent to Goodman would be forwarded to Travelers.

Travelers conducted an Examination Under Oath ("EUO") of the defendant on October 21, 2015. The transcript was read to the jury and a short excerpt of the audio was played after the government located the recording. At the EUO, the defendant claimed that the "throat was broke" on the front door when he left the building on July 28, 2015. For that reason, he taped it. Mr. Stavrakis explained that he set the alarm but he then disarmed the alarm because it was not properly set, and then he rearmed it. Further, he stated that he happened to have the tape with him because he was doing grout work at home.[8]

Ultimately, Travelers paid approximately $15 million on the Adcor insurance claim. The insurance money was used to replace several old machines at Adcor with new, state of the art equipment that cost almost $2 million. In addition, the defendant transferred about $600,000 to an account in his wife's name. The money was used to pay off private loans procured before the fire. And, the defendant made several purchases of personal property between August and

---

[8] As noted, the video showed that the defendant taped the door before attempting to arm the alarm. And, when the defendant re-entered the building, he was able to open the door without swiping his Brivo card.

December of 2015, such as a BMW for almost $53,000; a Harley-Davidson motorcycle for Adcor employee Bud Kuhrmann for $25,500; a Mercedes-Benz sport utility vehicle for almost $100,000; a men's $15,000 watch for Adcor's second in command, employee Mike Hyatt; a ladies' diamond ring for $12,500; and a men's watch for $7,800.

Additional facts are included in the Discussion.

### III.    Discussion

As noted, the defendant contends that his convictions rest on a mountain of assumptions. His taping of the front door at Adcor is central to all of the contentions.

According to the defense, the evidence that Mr. Stavrakis taped the door "is patently irrelevant if the arsonist entered Adcor *any* other way," *i.e.*, not through the front door.  ECF 229 at 7 (emphasis added by defendant).  In its view, defendant's taping of the front door was "wholly irrelevant" and "innocuous," unless the arsonist entered through the front door.  ECF 233 at 9.[9] And, the defendant hammers the point that "there is no evidence that the arsonist actually entered Adcor using that point of entry."  ECF 229 at 8.  In reply, the defendant asserts that "there was no actual evidence to support the pivotal conclusion that the arsonist entered through the front door, only an assumption that is not sufficiently connected on known facts to give rise to a permissible inference."  ECF 233 at 9.

The defendant observes that the building had "numerous potential points of entry" and thus the factfinder could not say "with substantial assurance that it is more likely than not that the intruder *must* have come through the front door simply because the keypad next to the front door

---

[9] In its opening statement to the jury, the defense characterized the incident of the taping of the door as a "red herring."

*may* have been used to disarm the alarm." *Id.* He adds that the government cannot convict on the basis of a "possibility." *Id.*

According to the defendant, "the roof hatch is the most plausible point of entry . . . ." ECF 233 at 9. He characterizes the roof hatch as "the other well-known point of entry that could have allowed an intruder to access that same keypad without entering through the front door or being captured on the camera system . . . ." *Id.* at 8.

Moreover, the defense notes that the alarm could have been disarmed from any of the three keypads in the building. It contends that merely because Partition One was disarmed first, this does not prove entry to the building at the front door. In the defense's view, the government has merely assumed that the arsonist entered the building through the front door, without any factual basis. ECF 229 at 7-8. In the absence of evidence as to the point of entry, argues the defense, the government's case "crumbles." ECF 233 at 9.

In effect, the defense suggests that the government generated smoke, but no fire. The defense has sliced the onion into thin layers, asking the Court to consider each layer separately. In doing so, the defense ignores the totality of the evidence, which constitutes a compelling circumstantial case. Indeed, the totality illustrates the proposition that "the whole is often greater than the sum of its parts . . . ." *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 588 (2018) (discussing probable cause); *see United States v. Drummond*, 925 F.3d 681, 687 (4th Cir. 2019) (same).

The evidence irrefutably showed that the defendant used tape at the front door, before he ever attempted to set the alarm. In other words, he taped the door without having experienced an actual alarm problem. This enabled him to bypass the swipe card system, the use of which is linked to a particular employee.

The intruder disarmed Partition One first, and several minutes elapsed before Partition Two was disarmed. Although Partition One could have been disarmed at one of three keypads located throughout the rather large building, the jury was entitled to infer that the intruder would first disarm the area where he/she was located. The front doors are adjacent to Partition One, and Partition One was disarmed first. In this regard, the jury could infer that if the intruder was in the vicinity of Partition Two, he or she would not have disarmed Partition One eight minutes *before* disarming Partition Two (12:25 a.m./12:33 a.m.).

In much the same way, the jury did not have to accept the roof hatch scenario. To make use of the roof hatch, the jury understood that it would have been necessary to use a ladder on a public street to gain access to the roof.[10] And, the evidence indicated that it could not be opened from the outside. Although it was dark when Mr. Romero reported the fire, he never saw a ladder outside the building. Miguel Hernandez, who lived at 218 S. Haven Street in 2015, also testified for the government. And, he never saw anyone with a ladder. The intruder also would have had to come down from the roof by way of an internal staircase into the kitchen, and then maneuver to avoid the motion detector in the lobby to reach a first-floor keypad to disarm the alarm. As the government puts it, the defense's theory is "wildly speculative . . . ." ECF 232 at 21.

To be sure, proof of motive does not establish guilt. But, the jury was entitled to consider the overwhelming evidence of Adcor's poor financial condition as a motive bearing on intent. And, as the government observes, "one person and one person only benefitted from this fire . . . ." ECF 232 at 27.

---

[10] The defendant's demonstrative evidence, played first in opening statement, showed the use of a ladder to access the roof.

As indicated, the fire occurred in an enclosed office area in the warehouse, known as the DNC Hut. The jury was entitled to conclude that the person who entered the building was quite familiar with the structure and Adcor itself. The individual knew how to disarm the alarm; clearly was familiar with the layout; and knew of the only can of methanol, including where it was stored. The arsonist also proceeded to a relatively unimportant part of the building to ignite the fire. The jury could have concluded that a person motivated by revenge would have proceeded to a more important target area, such as the defendant's office.

The defense relies on *United States v. Makriannis*, 774 F.2d 1164 (6th Cir. 1985) (unpublished table opinion), stating that it "bears uncanny resemblance" to the case sub judice. ECF 229 at 12.[11] There, the Sixth Circuit reversed the conviction of a restaurant owner accused of arson in order to collect insurance proceeds. In that case, the fire was arson; the business was in poor financial condition; the security system to the restaurant had been disarmed; there was no forced entry; the defendant was at home at the time of the fire; and there was suspicion of the accused as a result of questions he asked firefighters about whether a gas line was involved in the fire before the defendant would have known that detail of the investigation.

In reversing the defendant's conviction based on insufficiency of evidence, the Sixth Circuit said, *id.* at *1-2:

> The evidence clearly establishes arson. The evidence is not sufficient, however, to prove beyond a reasonable doubt that it was Makriannis who committed the arson. We find, at best, that the government's case presented evidence sufficient to support equally persuasive inference of both guilt and innocence. This equipoise cannot sustain a criminal conviction. *United States v. Leon*, 534 F.2d 667, 677 (6th Cir. 1976).
>
> There is sufficient evidence in the record to support the conclusion that defendant had both motive and opportunity to commit the arson. The government argues that

---

[11] According to West Law, it does not appear that the case has been cited in any judicial opinion.

it also established defendant's guilty knowledge of the arson beyond a reasonable doubt. The record does not support the government's contention in this regard.

*Makriannis* relied on *United States v. Leon*, 534 F.2d 667 (6th Cir. 1976). But, as the government points out, the Sixth Circuit has overruled *Leon*. *See United States v. Ellerbee*, 73 F.3d 105, 107 (6th Cir. 1996); *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984). The cases are also factually distinguishable. For example, the Sixth Circuit considered ambiguous what had been a key piece of the government's evidence, concerning the proof of an actual gas leak.

The defendant lodges additional challenges to his wire fraud conviction in Count Three, which concerned the submission of the bid to upgrade the surveillance and security systems. Mr. Stavrakis contends that the proof failed to establish that he had the requisite intent. The jury certainly could have reached that conclusion, as vigorously urged by the defense. But, that conclusion was not compelled by the evidence.

The defendant, the CEO of Adcor, was quite aware of the damage to Adcor's premises as a result of the fire. It was the defendant who told Mike Hyatt to obtain a bid because of damage to the security and video surveillance systems, and to submit the quote to Mr. Goodman. The defendant personally met with a representative of Strat Security, a company that submitted such a bid. It would have been clear from those discussions that an upgrade was contemplated. The bid included several new cameras, although only two were damaged in the fire.

Mr. Hyatt forwarded the bid to Mr. Goodman by email on September 16, 2015, as directed. He wrote, "Let me know how to proceed." Mr. Hyatt copied the defendant on this email to Mr. Goodman. Thereafter, Mr. Goodman forwarded the bid from Strat Security to Ed Cameron, his building estimator. In turn, Mr. Cameron sent the bid to Travelers on October 22, 2015, along with other estimates.

The defense claims there is no evidence that the defendant actually received, opened, or read the email that Hyatt sent with the bid. ECF 229 at 17. Moreover, the defense claims that the public adjuster did not obtain approval from the defendant before submitting items for payment. *Id.* at 16. Further, according to the defendant, the government's theory is flawed because the defendant would have known that Doug Fisher inspected the system for Travelers in the weeks after the fire, and he knew that the entire camera/surveillance system did not need to be replaced. *Id.* at 17. And, the defendant insists that it is clear on the face of the bid that it constituted an upgrade, so as to defeat any notion of an inflated claim. *Id.* at 18.

The jury was entitled to reject the defendant's effort to insulate himself from the conduct involving the bid. It was entitled to conclude that the defendant directed Hyatt to obtain the bid for an upgrade and to submit it under the guise of a covered loss.

As for the Motion for New Trial, I am mindful of the standard of review, which I set forth earlier. For the reasons stated by the government in ECF 232, and for the reasons discussed at oral argument on January 24, 2019, I see no merit to the defendant's contentions.[12]

The Motion is denied. An Order follows.

Date: February 7, 2020
                                            _____/s/_____
                                            Ellen L. Hollander
                                            United States District Judge

---

[12] To illustrate, the defense claims that the Court erred by propounding a willful blindness jury instruction. As I see it, the instruction was generated by the evidence. In any event, virtually the same instruction is embodied in the wire fraud instructions, to which the defendant did not object. Moreover, the jury was cautioned that guilty knowledge cannot be established if the defendant had an honest belief in the truth of his representations or if he was merely negligent or foolish.