IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED ENTERED
LOGGED RECEIVED

MAY – 3 2023

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY

DEPUTY

DEMETRIOS STAVRAKIS,

     Movant

   v.

UNITED STATES OF AMERICA,

     Respondent

Case No.: 19-cr-00160-ELH

MOTION FOR COMPASSIONATE RELEASE
UNDER 18 USC SECTION 3582(c)(1)(A)

Defendant, Mr. Demetrios Stavrakis, pro se, respectfully moves this Court
to grant this motion for Compassionate Release pursuant to the amended 18
USC Section 3582(c)(1)(A) based on the "extraordinary and compelling" reasons
set forth herein, and requests an order reducing his sentence to time served;
or in the alternative, modifying his judgment as the Court deems appropriate,
including but not limited to allowing the remainder of his sentence to be
served under supervised release, and if necessary with home confinement as
a condition of his release. After considering the "extraordinary and compelling"
reasons under Section 3582(c)(1)(A)(i), as elaborated by the Sentencing Com-
mission in USSG Section 1B1.13, the Court should grant the requested relief
in light of Mr. Stavrakis's multiple serious medical conditions and/or his
heightened risk for serious illness from COVID-19.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

The government charged Mr. Stavrakis in a four-count, second superseding indictment with, Count One, use of fire to commit a federal felony, to wit: wire fraud as charged in Counts Two and Three, in violation of 18 USC § 844(h); Counts Two and Three, wire fraud, in violation of 18 USC § 1343; Count Four, malicious destruction of real property by fire, in violation of 18 USC § 2.

Jury trial commenced on September 9, 2019, and after a seven week trial, on October 28, 2019, the jury returned verdicts of guilty on all counts, Sentencing was conducted on February 12, 2020. This Court entered its judgment of conviction and sentenced Mr. Stavrakis to concurrent five-year terms of imprisonment on Counts Two, Three, and Four, and a consecutive mandatory ten-year term of imprisonment on Count One, for a total of fifteen years. Both terms of imprisonment are statutory mandatory minimum sentences.

Mr. Stavrakis is presently incarcerated at FCI Loretto in Cresson, Pennsylvania. His projected release date is November 13, 2033.

<u>ARGUMENT</u>

I. <u>Exhaustion of Administrative Remedies Under the First Step Act</u>

On December 21, 2018, the President signed the First Step Act into law. Section 603(b) of the Act, titled "Increasing the Use and Transparency of Compassionate Release," amended 18 USC Section 3582(c)(1)(A) to provide the sentencing judge jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau

of Prisons to bring a motion on the defendant's behalf," or after "the lapse
of 30 days from the receipt of such a request by the Warden of the defendant's
facility, whichever is earlier[.]" First Step Act of 2018, Section 603(b),
Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

Prior to the Act's passage, motions for compassionate release could only be
filed with the court by the Bureau of Prisons (BOP). The First Step Act gave
prisoners the right to petition the court directly because the BOP had failed
to meaningfully exercise its authority to pursue compassionate release for
those who were eligible. See e.g., Dep't of Justice, Office of the Inspector
General, The Federal Bureau of Prisons' Compassionate Release Program, at
11 (April 2013)("The BOP does not properly manage the compassionate release
program, resulting in inmates who may be eligible candidates for release not
being considered.") Available at https://oig.justice.gov/reports/2013/e1306.pdf.
Indeed, between 1992 and 2012, on average less than two dozen individuals
a year received compassionate release following a motion by the BOP. See e.g.,
Human Rights Watch, The Answer is No: To Little Compassionate Release in US
Federal Prisons, https://www.hrw.org/report/2012/11/30/answer-no/to-little-
compassionate-release-us-federal-prison.

The First step Act's amendment to Section 3582(c)(1)(A) reflects the congres-
sional aim to diminish the BOP's control over compassionate release by per-
mitting inmates to file sentence reduction motions on their own behalf direct-
ly with the sentencing courts.

On March 27, 2023, Mr. Stavrakis petitioned the Warden of FCI Loretto for

compassionate release under Section 3582(c)(1)(A). See Exhibit A (Institutional Request). Since 30 days have passed without any action by the Warden, Mr. Stavrakis now pursues his compassionate release directly with this Court with the filing of this motion.

II.  The Sentencing Court Has the Authority to Reduce Mr. Stavrakis's Sentence Pursuant to 18 USC Section 3582(c)(1)(A)(i) Based on "Extraordinary and Compelling" Reasons.

Commonly termed the "Compassionate Release" provision 18 USC Section 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." United States v Hargrove, 30 F.4th 189, 194 (4th Cir 2022); See 18 USC Section 3582(c)(1)(A)(i). This provision is an exception to the ordinary rule of finality. United States v Jenkins, 22 F.4th 162, 169 (4th Cir 2021).

In order to be entitled to relief under Section 3582(c)(1)(A)(i), the district court must find that (1) "extraordinary and compelling reasons" warrant a reduction of sentence; (2) the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing Commission; and (3) on balance, the factors set forth in 18 USC Section 3553(a) warrant a reduction of sentence. United States v Robinson, 2022 US Dist LEXIS 212967 (D. Md. Nov. 23, 2022).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define" extraordinary and compelling reasons that might merit compassionate release. United States v McCoy, 981 F.3d 271, 276 (4th Cir 2020). Generally, "the district court enjoys broad discretion in conducting a Section 3582(c)(1)(A) analysis."

Jenkins, 22 F.4th at 169. But the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" United States v Taylor, 820 F. App'x. 229, 230 (4th Cir 2020)(per curiam)(citing 18 USC Section 3582 (c)(1)(A)). However, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendant's compassionate release motions, which means that the district courts need not conform, under Section 3582(c)(1)(A)'s consistency requirement, to [USSG] Section 1B1.13 in determining whether there exist extraordinary and compelling reasons for a sentence reduction." McCoy, 981 F.3d at 283; see also, Hargrove, 30 4th @4 194-195. Consequently, district courts are "empowered...to consider any extraordinary and compelling reasons for release that a defendant might raise." McCoy, 981 F.3d at 284 (quoting United States v Zullo, 22 F.4th at 170.

In the subsections that follow, the Court will find that extraordinary and compelling circumstances due to the inadequate medical treatment of Mr. Stavrakis's serious, chronic and debilitating medical and physical conditions justifies the court in granting this motion (Subsection A, infra), or in the alternative, because of the danger that the COVID-19 virus poses to his health due to his serious underlying health conditions, which place him at an increased risk of severe and potentially life-threatening illness (Subsection B, infra).

A.   Mr. Stavrakis's Serious Physical and Medical Conditions Meet the Standard in Cmt. N.(1)(A)(ii) of 18 USSG 1B1.13 Policy Statement for "Extraordinary and Compelling" Reasons.

Section 1B1.13 of the United States Sentencing Guidelines (USSG), entitled "Reduction in Term of Imprisonment Under 18 USC Section 3582(c)(1)(A)," sets forth the Sentencing Commission's policy statement applicable to compassionate release reductions. See USSG 1B1.13. For motions based on a defendant's medical conditions alone the policy statement requires that the defendant be "suffering from a serious physical or medical condition...that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Id. at cmt. n.(1)(A)(ii).

In spite of the recent changed made by the First Step Act, the court in United States v McCoy recognized that this policy statement "remains helpful guidance even when motions are filed by defendants." 981 F.3d 217, 282 n.7 (4th Cir 2020).

Mr. Stavrakis has a long history of serious medical conditions, he suffers from two broad categories of chronic and debilitating medical conditions: cardiovascular conditions and musculoskeletal conditions. See Exhibit B (BOP Medical Records) and Exhibit C (Physician's Medical Opinion).

Cardiovascular Conditions

Mr. Stavrakis suffers from peripheral vascular disease (PVD) resulting from atherosclerosis in the blood vessels of both legs. Atherosclerosis is the thickening and narrowing of the inner lining of the arteries, causing an

increase in blood pressure, and is central to the development of coronary
artery disease--the number one cause of death in the United States. John
Hopkins Family Health Book (JH), at 806-11. Mr. Stavrakis has atherosclerotic
hardening of the abdominal aorta and both common left and right popliteal
arteries, which supply blood to the lower legs and feet, limiting the flow
of blood, which brings oxygen and nutrients to the feet and removes waste
products, and causes intermittent calf and foot cramping, and dull aching
pain in his feet at night. He experiences vasculogenic claudication ('charlie
horse') pain when walking, he frequently stops every ten to fifteen steps
to alleviate the pain in his legs and feet or it becomes unbearable. He is
unable to exercise and often cannot go to the chowhall, skipping most of the
meals served. As a result, he frequently prepares his meals from commissary.
The selection of food sold is the same you find at a gas station or conveni-
ence store--quick snacks and unhealthy foods.

Mr. Stavrakis also suffers from coronary artery disease (CAD), also referred
to as atherosclerosis of the heart, which is the atherosclerotic plaquing
(hard blockages of calcium, cholesterol, blood cells, and fibrous tissue)
causing the narrowing of the coronary arteries, which supply blood to the
heart muscle ('myocardium'). See JH at 807-08. A limitation of oxygen to the
heart, due to the restricted blood flow of blood to the heart muscle, would
result in damage that "spreads like a wave" through the heart. Id. While it's
the most common cause of death in America, a lesser degree of CAD can result
in substantial disability.

Mr. Stavrakis's other risk factors for Cardiovascular disease include hyper-

lipidemia (high cholesterol), a risk factor for CAD and stroke; primary hyper-
tension (high blood pressure), a risk factor for CAD, stroke, and chronic
kidney disease; and metabolic syndrome with an HbAlc of 5.9 (borderline dia-
betes).

Musculoskeletal Conditions

Mr. Stavrakis suffers from morbid obesity. As of March 16, 2023, he has a
body mass index (BMI) of 39 and weighs 294 lbs. Since 2021 his weight has
increased 14 lbs. Obesity is a risk factor of cardiovascular disease and multi-
ple other physical ailments. Mr. Stavrakis's weight gain and its effect on
his health is exacerbated by lack of proper nutrition and inability to exercise
due to his worsening pain. Obesity has a profound effect on joints, two of
which have already been replaced--both hips. The prostheses were not designed
to tolerate 294 lbs. of weight, and thus also among the causes of his pain
when he walks.

He also suffers from chronic spinal pain and neuropathic sciatica pain. The
MRI done on December 5, 2022, shows spondylosis and disc herniations in the
thoracic and lumbar spine. His pain when sitting and lying in certain posi-
tions has worsened over the past two years.

Mr. Stavrakis suffers from a number of other musculoskeletal conditions cau-
sing him joint pain and difficulty with carrying out daily activities. These
include multiple thoracic spine disc herniations and lumbar disc herniations
resulting in painful neuropathic sciatica. His left olecranon (elbow) bursit
limits his use of his left arm along with a rotator cuff tear. He has severe

gout of both feet, especially the right hallux, and which is not being kept under control. (The limited nutritional selection of meats on commissary and the chow hall make gout particularly difficult to manage.) Also, he suffers joint pain from his bilateral hip replacements, and PVD induced severe "charlie horse" pains and muscle cramps and spasms in his legs.

These musculoskeletal conditions limit Mr. Stavrakis's ability to ambulate, perform activities of daily living and hygiene, exercise, and negatively impacts his physical and mental health by limiting his independence.

BOP medical records show that despite changes in medications, Mr. Stavrakis's medical, physical, and mental health continue to deteriorate. The latest labs done, February 24, 2023, show "severe atherosclerotic calcification within the bilateral pelvis, groin and proximal thighs" noted by radiologist, Justin Yoon, MD. An MRI taken in December 5, 2022, of his spine shows bulging annulus (disc) at T11-12, T12-L1, L1-2, L4-5, and L5-6, totaling over six of the seventeen thoracolumbar spine. An Arterial Duplex of his lower extremity done April 22, 2022, revealed a "left mid popliteal artery is occluded (blocked) and non-compressible," and also found diffuse plaque in the mid distal aorta and both common iliac arteries. And, an EKG done early in his incarceration, March 16, 2021, showed sinus brachycardia with right bundle branch block, poor R-wave progression and subsequent T-wave abnormality. See Exhibit B.

Dr. Collector, MD, a Board Certified Family Physician and Mr. Stavrakis's primary care physician, has reviewed Mr. Stavrakis's medical records from the BOP and finds that "since [his] incarceration his health is declining

rapidly." See Exhibit C. Dr. Collector notes that the degree of Mr. Stavrakis's coronary artery disease (CAD) is "significant." Id. That he had a heart cathe- terization November 23, 2020, which demonstrated diffuse CAD in multiple ves- sels," and his LAD, or widow-maker artery, had "diffuse disease with 40% stenosis." Id. Dr. Collector notes that Mr. Stavrakis's last blood work, January 30, 2023, showed an LDL cholesterol level of 112, which reflects inadequate management of his lipid profile." Id. He states that "[p]atients with severe [PAD] and [CAD] must be kept at an LDL of 70 or less, otherwise, it is well documented that they will have definite progression of disease." Id. He states that patients with severe PAD and CAD are "seen, at the bare minimum, at least every sic months by their cardiologists." Id.

The doctor observes that Mr. Stavrakis's uric acid levels on January 30, 2023, show he is "not at the therapeutic level needed to control his gout," which is "why he is having frequent gout attacks." Id. Dr. Collector explains that "gout is debilitating, and the pain is severe [, and] limits one's ability to ambulate, exercise and even sleep." Id.

Dr. Collector makes mention of Mr. Stavrakis's history of normal pressure hydrocephalus (NPH), id., which was first diagnosed from an MRI scan of his brain on January 5, 2021, following his complaints of dizziness." ECF No.360- 1. The government has made the BOP aware of Mr. Stavrakis's health problems. Id. However, Dr. Collector observes that the records show that the BOP has not reevaluated Mr. Stavrakis's NPH. Exhibit C. Dr. Collector states that Mr. Stavrakis needs a neurology evaluation, the MRI should have been repeated because this condition is progressive and may lead to dementia. Id.

Dr. Collector, based on his medical history and BOP medical records, finds that due to the inadequate medical treatment provided by the BOP, Mr. Stavrakis's medical conditions are progressively worsening and his physical health is deteriorating, and if this Court grants him compassionate release or home confinement that under his care he can provide Mr. Stavrakis with the required medical treatment and "turn this ship around." Id.

Dr. Collector in his opinion then specifies a treatment plan of the medical care he would pursue to address the areas concerning Mr. Stavrakis's health: He would "address Mr. Stavrakis's depression and weight gain, obtain consultation from nutrition, correct his lipid profile, glycemic control, fix his gout, and get him moving again[;] have cardiology, vascular surgery, and orthopedics all get involved regularly in his care"; and he would personally see Mr. Stavrakis every three months. Id.

Based on his review of the BOP medical records, Dr. Collector finds that the BOP has failed "to attain the standard of care, that are documentd quidline, in patients" who present a medical history like Mr. Stavrakis. Id.

In Dr. Collector's opinion; based on his medical expertise, as a practicing physician, and with a high degree of medical certainty," he concludes that Mr. Stavrakis's health "is declining." Id. However, Dr. Collector is "certain that [he] can help him [,]" and "[a]s it stands, [Mr. Stavrakis] is at a high risk for debility, stroke and heart attack." Id.

B.   The COVID-19 Pandemic, Which Poses Particular Dangers to Medically
     Vulnerable Inmates Like Mr. Stavrakis, Presents Extraordinary and
     Compelling Reasons that Justify Compassionate Release

The Fourth Circuit has noted that "COVID-19 raises medical issues in the

prison context that are particulary serious--it is highly communicable; it

is aggravated by certain other medical conditions; and it can be lethal."

United States v High, 997 F.3d 181, 185 (4th Cir 2021). Thus, a prisoner can

present an extraordinary and compelling reason related to COVID-19. Id.


This Court has the authority to base a finding of "extraordinary and compel-

ling" reasons under either Application Note 1(A) or 1(D) of the US Sentencing

Guideline Section 1B1.13. Regardless of which provision the Court relies on

Mr. Stavrakis's documented vulnerability (discussed in subsection 3, infra)

to COVID-19, combined with the fact that he is housed in a facility that has

undergone more than four outbreaks with infection rates at times exceeding

77% of the inmate population (even after administering the COVID vaccine and

boosters to well over half of the inmates) and where one inmate has died,

constitutes extraordinary and compelling reasons for compassionate release.


1.   The Court Has the Authority to Determine Other Extraordinary and
     Compelling Reasons for Compassionate Release

The Sentencing Commission is clear that extraordinary and compelling reasons

are not restricted to a certain set of circumstances. Application Note 1(D)

of USSG Section 1B1.13 states the extraordinary and compelling reasons exist

when "[a]s when determined by the Director of the [BOP], there exists in the

defendant's case an extraordinary and compelling reason other than, or in

combination with, the reasons described in subdivisions (A) through (C)."

United States v Wise, 2020 US Dist LEXIS 90431, *5 (D. Md. May 22, 2020).

The court in Wise explained, however, "USSG Section 1B1.13 is outdated in light of the First Step Act" because "[it] presupposes that Section 3582 review is available only upon motion by the BOP, which is no longer correct"; and thus, it is now the court, rather than exclusively the BOP, that can define whether extraordinary reasons "other than, or in combination with, the reasons described in subdivision (A) through (C)" exist. Id.

However, the Court need not resolve the issue whether the Court retains independent authority under Application Note 1(D) to determine that Mr. Stavrakis establishes extraordinary and compelling reasons for relief by virtue of his medical vulnerability during the COVID-19 pandemic. The Department of Justice has conceded that "if an inmate presents one of the factors identified by the Center for Disease Control that poses an increased risk of severe illness from COVID-19, they should be considered to be suffering from a 'serious physical or medical condition...that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover'- even if that condition in ordinary times would not meet the terms of the USSG policy statement." United States v Gardner, No. JKB-09-0619, ECF No.70, Gov't Resp. at 4 (describing "[c]urrent [DOJ] policy" (citing USSG Section 1B1.13 Application Note 1(A)(ii)(I))); see also, e.g., United States v Fischer, 2020 US Dist LEXIS 92766 (D. Md. May 27, 2020), No. ELH-14-0595, ECF No.98, Gov't Resp. at 11 n.2 (same).

As will be discussed in subsection 3, infra, Mr. Stavrakis meets the criteria for compassionate release under the Department of Justice's (DOJ) own Guidance.

2.    COVID-19 Pandemic and the Federal Prison System.

On March 11, 2020, the World Health Organization declared COVID-19 a global

pandemic. 'Rolling Updates on Coronavirus Disease (COVID-19)', World Health

Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019/even-

as-they-happen. By May 11, 2022, the United States "reached more than 1 mil-

lion COVID-19 deaths, according to a Reuters tally, crossing a once-unthink-

able milestone about two years after the first cases upended everyday life."

Trevor Hunnicutt & Jeff Mason, 'Biden marks one million US COVID deaths after

losing political battles,' Reuters (May 12, 2020), https://www.reuters.com/

world/us/biden-marks-1-million-americans-dead-covid-2020-05-12/. And, as of

October 19, 2022, COVID-19 has infected more than 97 million Americans. See

COVID-19 Dashboard, The John Hopkins Univ., https://bit.ly/2WD4XV9. This pan-

demic has been described as the worst public health crisis that the world

has experienced since 1918. See United States v Hernandez, 451 F. Supp. 3d

301, 305 (SDNY 2020)("The COVID-19 pandemic...presents clear and present danger

to a free society for reasons that need no elaboration.")


At the outset of the pandemic, in an effort to stem the spread of the virus,

people were urged to practice "social distancing" and to wear masks. See

'Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others', CDC,

https://bit.ly/3dPA8Ba.


However, social distancing is particularly difficult in the penal setting.

Seth v McDonough, 461 F. Supp. 3d 242 (D. Md. May 21, 2020); Senate Judici-

ary Hrg. Transcript on Incarceration during COVID-19, Rev.com (June 2, 2020)

(Testimony of BOP Director Carvajal at 47:00)("Prisons by design are not made

for social distancing. They are on the opposite made to contain people in one area.") Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. Id; see Cameron v Bouchard, 462 F. Supp. 3d 746 (E.D. Mich. May 21, 2020); see also, United States v Mel, 2020 US Dist LEXIS 74491, *3 (D. Md. Apr. 28, 2020)("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and spread of infection within prisons and detention facilities is particularly high.") Prisoners usually "share bathrooms, laundry, and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, 'An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues,' New York Times (Mar. 16, 2020).

Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited-to-stem-their spread. See Coreas v Bounds, 451 F. Supp. 3d 407, 408 (D. Md. Apr. 3, 2020)("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); see also, Eddie Burkhalter et al., 'Incarcerated and Infected: How the Virus Tore Through the US Prison System', N.Y. Times (Apr. 16, 2021)(stating that the cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of March 25, 2020 to Governor Hogan from approximately fifteen members of Johns Hopkins faculty at the Bllomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely."); see Kim Bellware, 'Prisoners and Guards Agree About

Federal Coronavirus Response: "We do Not Feel Safe," Washington Post (Aug. 24, 2020)(reporting prisoners made to use non-reusable masks for months, prisoners not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others.); accord Brown v Plata, 563 US 493, 519-20 (2010)(referencing a medical expert's description of the overcrowded California prison system as "breeding grounds for disease").

Due to the COVID-19 pandemic the FCI Loretto prison facility has been under modified operations since March 2020, in which movements have been limited, and visitations have been reduced to a certain day and time slot per week for each of the six housing units (and sometimes cancelled altogether). See Exhibit D (Visitation Schedule). For almost two of the past three years under the pandemic this prison facility was under complete lockdown; there was no leaving the housing units, so no outside recreation (nor indoor recreation due to social distancing requirements), no visitations, and all inmates were confined to their quarters where their daily meals were served.

Since the beginning of his prison term, Mr. Stavrakis has been assigned to a six-man room (S03-09) in South Two of the Southern housing units. He's lived there with five other inmates, each assigned to one of the three double-bunks. The bunks are always full. He and his five roommates share approximately 180 square feet of floor space (far less than the 60 square foot minimum required by Congress for each inmate (360 total)) that is cluttered with three double bunks and six lockers. See Exhibit E (Layout of Room S03-09).

This 'six-man room' is the most common room layout in the Southern and North-ern housing units. The four-man rooms are exactly half the size--split right down the middle. Notably, the living quarters of the Central housing units are far worse. The inmates share eight-man barracks style cubicles with even less floor space than that enjoyed by inmates in six-man rooms.

There are 17 rooms in South Two of the Southern housing unit. It holds 94 inmates and is regularly filled to capacity. The amenities shared by South Two inmates are six showers, four toilets, three urinals, and one bathroom sink. The hallway that runs down the length of South Two is exactly six feet wide. Even when the prison facility is under complete lockdown, no inmate has the ability to 'social distance' themselves. For various reasons when COVID-19 has entered the facility, and which has proved to easily pass be-tween the housing units, the virus tears through that housing unit and if not infecting everybody, infects nearly everyone.

While the COVID-19 virus may have ceased to be a global epidemic, it has not gone away. It still remains an ongoing reality, and goes unnoticed during the spring and summer months when those infected show no symptoms. As winter approaches and the cold temperatures force people indoors in greater numbers, outbreaks of the virus and the numbers of those infected will surge again.

3.    The Deadly COVID-19 Pandemic Presents Extraordinary and Compelling
      Reasons for Mr. Stavrakis's Release.

In November 2022, the CDC updated its guidance to reflect the most avail-able data identifying risk factors for severe illness due to COVID-19 in-

fections. See People with Certain Medical Conditions, 'CDC (November 22, 2022),
https://bit.ly/38S4NfY. According to the CDC, the factors that put individuals
at a higher risk for severe illness, regardless of their age, include: cancer,
chronic kidney disease; chronic liver disease; chronic lung disease; dementia
or other neurological conditions; diabetes (Type I and Type II); certain men-
tal disabilities; heart conditions, such as heart failure, coronary artery
disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompro-
mised; obesity, where the Body Mass Index (BMI) is 25 or higher; physical
inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood
stem cell transplant; stroke of cerebrovascular disease; mental health con-
ditions; substance use disorders; and tuberculosis. Id. Additionally, the
CDC has warned that people who use corticosteroids or other immune weakening
medicines might be at an increased risk for severe illness from COVID-19.
CDC, 'People of Any Age with Underlying Medical Conditions,'
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-
medical-conditions.html.

The CDC has indicated that the risk for severe illness from COVID-19 increases
with age, with older adults at highest risk. See 'Older Adults At Greater
Risk of Requiring Hospitalization or Dying If Diagnosed with COVID-19,' CDC
(November 27, 2020), https://bit.ly/3glUSZl. Furthermore, "[t]he risk of se-
vere illness from COVID-19 increases as the number of underlying medical con-
ditions increases in a person," 'People with Certain Medical Conditions,'
supra. As to the CDC's risk factors in the context of a motion for compas-
sionate release, the Fourth Circuit said that "the use of a bright-line rule
that accepts only the CDC's highest risk conditions is too restrictive."
Hargrove, 30 F.4th at 195.

Mr. Stavrakis's medical records (Exhibits B and C) confirm that he has a number of conditions identified by the CDC that puts him at a higher risk of severe illness from COVID-19: he is 57 years old and suffers from: serious heart conditions, such as cardiac disease, hyperlipidemia, peripheral vascular disease, atherosclerosis, and primary hypertension; and additionally, suffers from morbid obesity with a BMI of 39 and a weight of 294 lbs. Furthermore, medical records show that Mr. Stavrakis is administered corticosteroid injections (which is an immuno-suppressant) to treat his severe gout. Also, Mr. Stavrakis suffers from metabolic syndrome (borderline diabetes), which may be a consideration for this Court.

As noted earlier, the "risk of severe COVID-19 [infection] increases as the number of underlying medical conditions increases in a person." 'People with Certain Medical Conditions,' supra. With multiple co-morbidities, Mr. Stavrakis is uniquely vulnerable to falling seriously, even gravely, ill should he contract the virus. Id; see also, United States v Stockton, 2020 US Dist LEXIS 169584 (D. Md. Sept. 16, 2020), No. ELH-99-0352, ECF No.657 at 16 (stating that the fact that the defendant has multiple underlying conditions "may aggravate his vulnerability to COVID-19"). Indeed numerous courts, including this Court, have determined that these ailments, alone or in combination with others, constitute extraordinary and compelling reasons for compassionate release given the spread of the virus within the BOP prison system. See, e.g., United States v Baldwin, 2020 US Dist. LEXIS 152141 (D. Md. Aug. 21, 2020), No. ELH-17-0165, ECF No.73 at 13 (hypertension and pre-diabetes); United States v Cuevas, 2020 US Dist LEXIS 137562 (D. Md. Aug. 3, 2020), No. GJH-16-0451, ECF No. 231 at 8, 10-11 (hypertension, obesity, and pre-diabetes).

Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions such as those suffered by Mr. Stavrakis, See, e.g., United States v Azianbidji, 2021 US Dist LEXIS 17474, *1 (D. Md. Jan. 29, 2021)(defendant with hyperlipidemia, hypertension, and obesity); United States v White, 2020 US Dist LEXIS 122576, *2-3 (D. Md. July 10, 2020)(defendant with neutropina, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); United States v Oaks, 2020 US Dist LEXIS 109775, *3 (D. Md. June 23, 2020)(defendant with Type II Diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis); United States v Hillow, 2020 US Dist LEXIS 96517, *4 (D. NH. June 2, 2020)(defendant with asthma, migraines, hypertension, hyperlipidemia, pre-diabetes, and border-line obesity); United States v Gutman, 2020 US Dist LEXIS 84316, *2 (D. Md. May 13, 2020)(finding defendant's age of 56 years, multiple sclerosis, and hypertension constituted extraordinary and compelling reasons); United States v Coles, 2020 US Dist LEXIS 72327, *7 (C.D. Ill. Apr. 24, 2020)(granting com-passionate release to defendant with hypertension, pre-diabetes, prostate issue, bladder issue, and a dental infection); United States v Quintero, 456 F. Supp. 3d 130, 132 (WDNY 2020)(finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted extraordinary and com-pelling reasons); United States v Rodriquez, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020)(finding defendant's hypertension and diabetes qualifies as extra-ordinary and compelling reasons).

There are some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition. See, e.g., United States v Salvango, 456 F. Supp. 3d 420, 423, 427-29 (NDNY 2020); United

States v Sawicz, 453 F. Supp. 3d 601, 604-05 (EDNY 2020).

The Court in United States v Chavez-Zarate was persuaded that due to his coronary atherosclerosis the defendant suffered from "a serious deterioration in physical...health because of the aging process," which placed him at greater risk of becoming severely ill if he were to contract COVID-19 virus. 2020 US Dist LEXIS 156988, *18-19 (E.D. Cal. Aug. 28, 2020); see USSG Section 1B1 comment note 1(B).

Numerous other courts have included atherosclerosis (a cardiovascular illness not specifically maned by the CDC as a risk factor regarding COVID-19) in finding extraordinary and compelling reasons. See, e.g., United States v Farly, 2020 US Dist LEXIS 145520, *3 (D. DC Aug. 13, 2020)(defendant suffers from Type II diabetes mellitus, hypertension, atherosclerosis, and obesity); United States v Wheelock, 2021 US Dist LEXIS 99684, *2 (D. Minn. May 26, 2021) (defendant suffered from "Type II Diabetes and severe atherosclerosis to both legs that substantially diminish[ed] his capacity for self-care in prison."); United States v Tillman, 2020 US Dist LEXIS 28242, *6 (E.D. La. Feb. 16, 2021)(district court described defendant's medical condition as serious, which comprised of anemia, atherosclerosis, foot ulcer secondary to diabetes mellitus with diabetic neuropathy); United States v Archer, 2021 US Dist LEXIS 210158, *9-10 (M.D. Fl. Nov. 1, 2021)(defendant suffered from diabetes, obesity, hypertension, coronary atherosclerosis); United States v Brown, 2020 US Dist LEXIS 178939, *2 (E.D. Penn. Sept. 29, 2020)(defendant suffered from atherosclerosis, asthma, sleep apnea, prediabetes, obesity, kidney disease, and hypertension); United States v Bellamy, 2019 US Dist LEXIS 124219, *7

(D. Minn. July 25, 2019)(defendant suffers from heart failure, atherosclerosis, Type II diabetes, kidney disease, hypertension, hyperlipidemia, esophageal reflux, sleep apnea, osteoarthritis, and asthma).

Also, to address the Government's concern that Mr. Stavrakis tested positive for the virus in 2021, "a defendant's eligibility for compassionate release is not defeated because a defendant has had COVID-19." United States v Robinson, 2022 US Dist LEXIS 212967, *36-37 (D. Md. Nov. 23, 2022). As aptly said by Judge Chuang in United States v Fletcher, 2020 US Dist LEXIS 124089, *3 (D. Md. July 13, 2020): "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity." See United States v Heyward, 2020 US Dist LEXIS 11821, *2 (D. Md. June 30, 2020)(noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible"). It is well documented that "reinfections do occur after COVID-19." 'Reinfections and COVID-19,' CDC, https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html; see also, e.g., Fletcher, 2020 US Dist LEXIS 124089, at *3.

Finally, assuming in favor of the government for argument's sake that the BOP is effectively treating Mr. Stavrakis's multiple serious chronic medical conditions, according to CDC guidelines, no distinction is made between treated and untreated complicating factors in risk assessments, with those being treated still at high risk. United States v Kirschner, 2020 US Dist LEXIS 124496 (S.D. Ind. July 15, 2020)("The Government argues that [the defendant] does not fit the CDC's criteria for individuals at an increased risk

of severe illness because his COPD and hypertension have been effectively
managed through medication. But the CDC Guidelines make no such distinction.");
United States v Hunt, 459 F. Supp. 3d 932, 939 (E.D. Mich. 2020)(rejecting
the Government's argument that monitoring and treatment support denying mo-
tion for release).

III. Apply the Section 3553(a) Factors, the Court Should Exercise Its
   <u>Discretion to Reduce Mr. Stavrakis's Sentence</u>

18 USC Section 3553(a) specifies the factors courts are to weigh in imposing

a sentence. The list of factors is preceded by a broad admonition that courts

"impose a sentence sufficient, but not greater than necessary, to comply with

the purposes of sentencing, which the statute identifies as just punishment,

deterrence, protection of the public, and rehabilitation. <u>Id</u>.

Ultimately, the Court may reduce Mr. Stavrakis's sentence under 18 USC Section

3582(c)(1)(A) after (1) the defendant establishes extraordinary and compelling

reasons for the reduction, and (2) the court finds that a reduction in the

defendant's sentence would not undermine the relevant Section 3553(a) factors

and any applicable policy statement issued by the Sentencing Commission. <u>United

States v Zinner</u>, 2022 US Dist LEXIS 1687, *13 (E.D. Va. Jan. 4, 2022).

The court in Zinner in discussing the sentencing factors stated that:

> "The Fourth Circuit provides additional guidance in <u>United States v
> Kibble</u>. It explained that the district court must reconsider the 3553(a)
> factors in view of extraordinary and compelling circumstances present
> in the defendant's case. In his concurring opinion, Chief Judge Gregory
> makes it even more clear that the district court may not fulfill its
> duty to reconsider the Section 3553(a) factors by merely recounting the
> considerations that supported the original sentence. (Gregory C.J.,
> concurring). Section 3582(c)(1) necessarily envisions that the Section
> 3553(a) factors may balance differently upon a motion for compassionate
> release than they did at the original sentencing. If a district court's
> original Section 3553(a) analysis could always prove that a sentence
> reduction would intolerably undermine the Section 3553(a) factors, then
> 18 USC 3582(c)(1) would, in effect, be a nullity."

<u>United States v Zinner</u>, 2022 US Dist LEXIS 1687 (E.D. Va. Jan. 4, 2022)(quo-

ting <u>United States v Kibble</u>, 992 F.3d 326 (4th Cir 2021)(quotations omitted).

Furthermore, in <u>Kibble</u>, Judge Gregory notes that "[a] day in prison under

the current conditions is a qualitatively different type of punishment than

one day in prison used to be," and that "[t]hese conditions, not contemplated
by the original sentencing court, undoubtedly increase a prison sentence's
punitive effect." 992 F.3d 326, 336 (4th Cir. 2021). cert. denied, 142 S.
Ct. 383 (2021). Thus, the court must "reconsider [] the 3553(a) factors" to
determine whether the sentence remains no greater than necessary to meet
3553(a)'s goals "in view of the extraordinary and compelling circumstances."
Id, at 332.


The Second Circuit, in United States v Halvon, has been given the opportunity
to address the question of mandatory minimum sentences with respect to motions
for sentence reduction; which is particularly instructive to the instant mo-
tion, Mr. Stavrakis is currently serving under two mandatory minimum senten-
ces. The appellate court in Halvon stated that the district court has a "broad
discretion" to consider a motion for compassionate release, and held that
a mandatory minimum sentence does not preclude a district court from reducing
a term of imprisonment "under such motion." 26 F.4th 566, 569-70 (2d Cir.
2022)(citing, United States v Owens, 996 F.3d 755 (6th Cir. 2021)(reversing
the district court's order denying compassionate release and remanding to
the district court in a case where the defendant was originally sentenced
to the mandatory minimum), and United States v Black, 999 F.3d 1071 (7th Cir.
2021)(vacating and remanding in the same situation)); see also, United States v
Thacker, 4 F.4th 569, 574 (7th Cir, 2021)(expressing "broader concerns" that
judges could use compassionate release to effectively countermand Congress's
mandatory minimum sentences on the basis of policy disagreements but also
clarifying that those serving mandatory minimum sentences are nonetheless
eligible for release, so long as it is granted on other grounds, stating "we

are not saying the extraordinary and compelling individual circumstances...
cannot in particular cases supply the basis for a discretionary sentencing
reduction of a mandatory minimum sentence.") The court's discretion also in-
cludes the power to reduce, as well as to eliminate, the remaining term of
a defendant's sentence. United States v Brooker, 976 F.3d 229 (2d Cir. 2020).

Section 3553(a)(1) asks the Court to account for "the history and character-
istics of the defendant." 18 USC Section 3553(a)(1). Prior to the current
offence Mr. Stavrakis has no criminal history. At 57 years of age, Mr. Stav-
rakis has been a self-made businessman and family man most all his life. The
prosperity of his family, in spite of his present incarceration, tell a lot
about his personal character and success as a husband and a father. Mr. Stav-
rakis has been married to his high-school sweetheart, Antonia, for 32 years.
They are the proud parents of three girls and one boy. The oldest daughter,
Maria, is married and just brought a second child into the world this past
March.  Maria graduated from UMBC with Honors, obtained her Masters from
Stevenson University in business and technology management, graduating top
of her class, and is employed as a materials manager. The second child,
Georgia, is newly-wed just this past June 2022. 'Gia', as she is affection-
ately called, graduated from Towson State University in Kineseology with
Honors. Presently, Gia  is employed as a Sonographer, and this coming April
she will graduate from the University of Maryland with a Masters in Medical
Administrative Management. The youngest daughter, Katerina, just got married
January of this year. 'Kat' obtained her undergraduate degree from Tampa
University, and her Juris Doctor from Cooley School of Law at the University
of Michigan. Kat passed the Florida Bar exam in 2021, and is currently a

a deputy district attorney of the Hillsboro County (Fl.) Felony division. And his son, Konstantinos, will graduate this coming April from Loyola University in Mechanical Engineering, at the top percentile of his class.

Under United States v Pepper this Court must consider post-offense developments under Section 3553(a), which provides "the most up-to-date picture" of the defendant's history and characteristics and "sheds light on the likelyhood that [the defendant] will engage in further criminal conduct." 562 US 476, 492 (2011). Additionally, the Sentencing Commission has advised courts to consider whether, based on the factors set forth in 18 USC Section 3142(g), a defendant would present a danger to the safety of any other person or to the community if released. USSG 1B1.13(2). As previously noted, pursuant to United States v McCoy, the policy statement is not binding, but provides useful guidance. 981 F.3d 271 (4th Cir 2020).

While out on pre-trial release, under the supervision of the U.S. Probation Office, until the day of his self-surrender, a period of more than one year, Mr. Stavrakis's conduct was that of like a model citizen, following all the rules of his supervision and not violating any terms of his release. Futhermore, for the duration of his incarceration, Mr. Stavrakis has had no disciplinary violation and his institutional record is devoid of any such charges. Moreover, his recidivism pattern score is reported "minimum/minimum," the lowest rate possible. See Exhibit F (PATTERN Recidivism Risk Assessment).

Additionally, in considering the need to "protect the public from further crimes of the defendant," 18 USC Section 3553(a)(2)(c), in addition to those

relevant considerations discussed above the Court should consider Mr. Stav-
rakis's viable release plan (Exhibit A, at 3). He will reside at home with
his wife in his home town of Baltimore, Maryland, where he has long time ties
to the local community and churches, and from both of which will support him
and his family as he reenters the community. His wife, Antonia, will provide
for his support and medical care. From her employment she earns more than
enough to afford both their expenses. Upon release or home confinement he
will work full-time (remotely from home if necessary). From home he will obtain
the proper medical treatment from his physician and medical specialists needed
to care for serious chronic medical and physical conditions. Also, the Court
should take note that Mr. Stavrakis will be under the supervision of the U.S.
Probation Office (judgment providing for three year term of supervised release).
As the Court aptly stated in its opinion regarding the defense's motion to
postpone the August 3, 2020 date of surrender, 2020 US Dist LEXIS 135355,
*4 (D. Md. July 29, 2020), "...despite the gravity of the underlying offense,
I do not believe that the defendant poses a physical danger to the community
at large."

The Section 3553(a)(2)(D) focused on the need to provide the defendant with
appropriate "medical care...in the most effective manner," favors Mr. Stav-
rakis's release. Mr. Stavrakis has a history--a litany--of serious medical
and physical health issues, including coronary artery disease, peripheral
arterial disease, hyperlipidemia, atherosclerosis, hypertension, dysmeta-
bolic syndrome, borderline diabetes, and normal pressure hydrocephalus. He
suffers from gout, degenerative disc disease of the spine, degenerative joint
disease, leg pains and muscle cramps, and a BMI of 39. Given the inadequate

medical treatment by the BOP Health Services, and the opinion by Mr. Stav-rakis's physician regarding the seriousness of Mr. Stavrakis's physical and mental decline, the Court should find that a reduction of sentence to time served would meet the need for the sentence imposed and to provide Mr. Stav-rakis with "medical care...in the most effective manner." See 18 USC Section 3553(a)(2)(D).

Should the Court have any remaining concerns about community safety, it can add a period of home confinement as a condition of his supervised release. See, e.g., United States v Fletcher, 2020 US Dist LEXIS 124089 (D. Md. July 13, 2020), No. TDC-05-0179, ECF No.856 (adding a period of home confinement as a condition of supervised release); United States v Heyward, 2020 US Dist LEXIS 115821 (D. Md. June 30, 2020), No. PWG-17-0527, ECF No.83 (same); United States v Magnis, No. ELH-15-0261, ECF No.403 (D. Md. June 18, 2020)(same).

CONCLUSION

For the foregoing reasons, Mr. Stavrakis has demonstrated extraordinary and compelling reasons for compassionate release, and respectfully requests that the Court grant his motion pursuant to Section 3582(c)(1)(A)(i) and reduce his sentence to time served and order his release, so he may obtain from his physician and specialists the adequate medical care required to treat his serious, chronic and debilitating medical and physical conditions, or, in the alternative, so he may isolate himself from the dangers that the COVID-19 virus poses to his health due to his serious underlying health conditions, which place him at an increased risk of severe and potentially life-threatening illness.

If the Court has any remaining concerns of the danger Mr. Stavrakis may pose to the community, the Court may add home confinement as a condition of his supervised release, not to exceed the unserved portion of his original sentence.

Respectfully submitted,

Mr. Demetrios Stavrakis, pro se