IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

DEMETRIOS STAVRAKIS,
*Defendant.*

Criminal No. ELH-19-0160

**MEMORANDUM OPINION**

This Memorandum Opinion addresses several motions for compassionate release filed by or on behalf of defendant Demetrios ("Jimmy") Stavrakis, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Following a lengthy trial in late 2019, a jury in the District of Maryland convicted Stavrakis of various offenses relating to an arson that occurred at the defendant's business in 2015. ECF 226. At sentencing in February 2020, the Court imposed the mandatory minimum sentence of fifteen years of imprisonment. ECF 255. The Fourth Circuit affirmed. ECF 395, ECF 398.

Defendant, while pro se, filed a compassionate release motion on May 3, 2023 (ECF 399), supported by exhibits.[1] He cited his "long history of serious medical conditions," which he described as "chronic and debilitating . . . ." *Id.* at 6. Among other conditions, defendant cited peripheral vascular disease resulting from atherosclerosis in the abdominal aorta and popliteal arteries; coronary artery disease; hypertension; hyperlipidemia; morbid obesity; gout; musculoskeletal conditions; and mental health issues. *Id.* at 611. Defendant also complained of inadequate medical treatment. *Id.* at 28-29. And, he claimed that the COVID-19 virus "place[s]

---

[1] Defendant, through counsel, filed an earlier compassionate release motion. ECF 382. The government's response is docketed at ECF 386. Defendant replied. ECF 388. I denied that motion on January 20, 2022. ECF 391.

him at an increased risk of severe and potentially life-threatening illness" due to his "underlying health conditions. . . ." *Id.* at 5; *see also id.* at 12.

The Office of the Federal Public Defender ("FPD") declined to represent defendant. ECF 401. The government filed an opposition (ECF 407), along with defendant's medical records from the Bureau of Prisons ("BOP"), for the period 2021 to 2023. *See* ECF 409-2; ECF 409-3. Defendant replied. ECF 411.

On July 28, 2023, defendant filed a pro se post-conviction petition under 28 U.S.C. § 2255. ECF 406. Briefing ensued. *See* ECF 416ECF 418, ECF 419, ECF 420, ECF 421. Defendant also sought discovery. ECF 425. By Memorandum Opinion and Order of July 3, 2024, I denied the post conviction petition and discovery request. ECF 439, ECF 440, ECF 445. Defendant noted an appeal to the Fourth Circuit (ECF 442), which is pending.

In April 2024, defendant was diagnosed with Oropharyngeal cancer with metastasis to the lymph nodes. *See*, *e.g.*, ECF 422; ECF 437; ECF 464 at 138. As a result, defendant filed several supplements to his compassionate release motion, along with exhibits.[2] *See* ECF 422, ECF 424, ECF 432, ECF 433, ECF 435; *see also* ECF 428, ECF 430, ECF 431, ECF 437. By Order of June 6, 2024 (ECF 434), I appointed counsel for defendant.[3] Counsel subsequently proposed a briefing schedule, which I approved. ECF 456.[4]

---

[2] For the most part, defendant's medical records have been filed under seal.

[3] By letter to the defendant on May 24, 2024 (ECF 429), I informed the defendant that, despite the FPD's earlier decision not to represent the defendant, I asked the Court's Criminal Justice Act Coordinator to locate an attorney for him.

[4] Understandably, defendant's attorney needed time not only to review the defendant's medical records but also to locate experts to assist the defense.

On June 16, 2025, through counsel, defendant filed a "Motion For A Reduced Sentence Pursuant To 18 U.S.C. § 3582(c)(1)(A)(i)." ECF 458. It is supported by exhibits. I shall refer to ECF 458, as well as the defendant's earlier compassionate release filings, collectively as the "Motion." And, I shall consider defendant's counseled submission at ECF 458 as the operative compassionate release motion. This is because defense counsel was aware of the content of defendant's earlier submissions when he filed ECF 458, and he had the opportunity to adopt, include, and/or incorporate any relevant matter set forth in defendant's earlier filings.

The government opposes the Motion. ECF 462. The government also filed additional medical records for the defendant, docketed at ECF 464. Then, on August 18, 2025, the government filed a supplement (ECF 466), with two additional medical exhibits. *See* ECF 468.[5] Defendant replied. ECF 470.

The Court held a lengthy telephone conference with counsel on September 3, 2025, to address deficiencies in the medical records submitted to the Court. ECF 473; *see also* ECF 471. Inexplicably, neither side provided the Court with any medical records concerning the defendant's cancer diagnosis in 2024 or his cancer treatment. Indeed, neither party provided the Court with any records from 2024. *Id.* These important medical records were not submitted until September 8, 2025, and only after the Court requested them. ECF 474, *see* ECF 476, ECF 477.[6] And, even then, clarification was required. *See* ECF 479, ECF 480.

_____

[5] In its opposition at ECF 462, the government cites only to its "Exh. 4." That exhibit, consisting of 144 pages of medical records, is docketed at ECF 464. However, in the government's submission of August 18, 2025 (ECF 466), the government made reference to exhibits 1 through 3. They are medical records of the defendant that were appended to the government's submission in August 2023. *See* ECF 407, ECF 409.

[6] The government provided the Court with a courtesy copy of the records on September 10, 2025. One group of records is labeled Exhibit 7. It consists of defendant's BOP medical

For the reasons that follow, I shall grant the Motion and reduce defendant's sentence to 85 months of incarceration (*i.e.*, seven years and one month).

## I.    Procedural Background

Defendant was indicted on March 28, 2019.  ECF 1.  In a Second Superseding Indictment, filed on June 6, 2019, Stavrakis was charged with multiple offenses.  ECF 94.  Count One charged use of fire to commit a federal felony, *i.e.*, wire fraud, as charged in Counts Two and Three, in violation of 18 U.S.C. § 844(h)(1).  Counts Two and Three charged wire fraud, in violation of 18 U.S.C. § 1343.  Count Four charged malicious destruction of real property by fire, in violation of 18 U.S.C. § 844(i).[7]

By statute, Count One carried a mandatory minimum penalty of ten years of incarceration, consecutive to any other term of imprisonment.  Count Four required a mandatory minimum term of imprisonment of five years.  Therefore, at a minimum, if convicted, defendant faced a minimum of fifteen years of imprisonment for these two offenses.  Counts Two and Three carried statutory maximums of twenty years.  *See* ECF 257 (Amended Presentence Report or "PSR"), ¶ 87.

Trial commenced on September 9, 2019.  ECF 149.  The government called about 60 witnesses.  Ten witnesses testified during the defendant's case.  Approximately 700 exhibits were

---

records for 2024.  Exhibit 8 is labeled "2025."  It contains medical records from January 2025 through August 20, 2025.  Copies of the records were also filed in searchable PDF format.

During the pendency of the Motion, there have been changes made in regard to access to sealed records.  For convenience, I will cite to the records by reference to the exhibit number and the page number on the courtesy copies, rather than CM/ECF, as is my customary practice.  The page number is noted in red on the hard copy, at the bottom right of each page.

[7] Defendant was charged with each offense pursuant to 18 U.S.C. § 2, which provides, in part:  "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

introduced into evidence.  Trial concluded on October 28, 2019.  ECF 217, ECF 226.  On that date, the jury convicted defendant on all four counts.  ECF 217, ECF 226, ECF 227.

The government's evidence established that on July 29, 2015, Stavrakis, the President and sole owner of Adcor Industries, Inc. ("Adcor"), aided and abetted the commission of arson of a structure that housed Adcor and related businesses.  As a result of the fire, Travelers Indemnity Company of America ("Travelers"), which had issued a commercial property insurance policy to Adcor, paid about $15 million on the claims submitted under the insurance policy, to the benefit of Adcor and defendant.

Sentencing was held on February 12, 2020.  ECF 251.  At the time, defendant, who was born in November 1965, was 54 years old.  ECF 257 at 3.  As the defense correctly observes, there was an "outpouring of community support" for the defendant (ECF 458 at 7), which I described as "staggering."  ECF 312 (Tr., 2/12/20), at 96.  I also recognized that each conviction "casts an indelible stain on what had been [defendant's] sterling reputation."  *Id.* at 100.

Pursuant to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), Counts Two, Three, and Four were grouped for purposes of calculating defendant's advisory sentencing Guidelines, and were identified collectively as Group I.  *See* ECF 257, ¶ 54; *see also* U.S.S.G. § 3D1.2(b).  For Group I, defendant had a final offense level of 33, with a Criminal History Category of I.  ECF 257, ¶¶ 63, 67. Defendant's Guidelines for Group 1 called for a sentence ranging from 135 months to 168 months of incarceration.  ECF 257, ¶ 88.

At sentencing, I noted, *inter alia*, that the amount of the loss, *i.e.*, the insurance claim and payment, significantly inflated the defendant's offense level for Group 1, because the size of the loss resulted in an enhancement of twenty levels.  ECF 312 at 102.  In my view, the amount of loss

is an arbitrary metric to measure misconduct.  There is a "mechanical correlation between loss and offense level."  *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005).

Group 2 consisted only of Count One.  The Guidelines for Count One corresponded to the mandatory minimum term of imprisonment of ten years (120 months), consecutive.  *See* U.S.S.G. § 2K2.4.

Defendant's total Guidelines for Group 1 and Group 2 called for a sentence of imprisonment ranging from 255 to 288 months (*i.e.*, 21 years, 3 months to 24 years).  *See* ECF 257, ¶¶ 63, 64, 87, 88.  I characterized the Guidelines as "draconian."  ECF 312 at 95.

As mentioned, based on the mandatory minimum sentences for Counts One and Four, defendant faced a minimum sentence of fifteen years of imprisonment.  The government sought a sentence of twenty-two years of imprisonment.  *See* ECF 240 (government. sentencing memo), at 1, 4-6; ECF 312 at 81.  In contrast, the defendant sought a sentence no greater than the mandatory minimum.  ECF 237 at 4.

After a lengthy hearing, the Court sentenced defendant to the required minimum term of fifteen years of imprisonment.  ECF 255; ECF 258.  In particular, the Court imposed concurrent terms of five years of imprisonment with respect to Count Two (wire fraud), Count Three (wire fraud), and Count Four (malicious destruction of real property by fire).  *Id.* at 1–2.  And, the Court sentenced defendant to the required minimum sentence of ten years, consecutive, with respect to Count One (use of fire to commit a federal felony).  *Id.* at 2.  The Court subsequently entered an order of restitution in the amount of $15,525,602.55.  ECF 262, ECF 263, ECF 264.  The Court also ordered forfeiture of certain property.  ECF 380.  And, the Court set a self-surrender date for defendant of April 20, 2020.  *See* ECF 255 at 2, ECF 258 at 2, ECF 264 at 2.

Defendant noted an appeal to the Fourth Circuit. ECF 266. In a 19-page unreported opinion issued on February 24, 2022 (ECF 395-1), the Fourth Circuit affirmed. ECF 395; *see United States v. Stavrakis*, 2022 WL 563242 (4th Cir. Feb. 24, 2022) (Harris, J.). The Fourth Circuit subsequently denied defendant's request for rehearing *en banc*, ECF 397, and the mandate issued on April 13, 2022. ECF 398. Thereafter, on September 2, 2022, defendant filed a petition for certiorari with the Supreme Court. *See Stavrakis v. United States*, 143 S. Ct. 309 (2022). The Supreme Court denied the petition on October 11, 2022. *See id.*

As noted, at sentencing on February 12, 2020, the Court granted defendant approximately two months to self-surrender, *i.e.*, until April 20, 2020. *See* ECF 258, ECF 264.[8] However, in the time between sentencing and the defendant's anticipated surrender date, the world as we know it was upended by COVID-19,[9] which spawned the worst public health crisis in over 100 years. *See*, *e.g.*, *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020) (stating that, due to COVID-19, the nation is "in the grip of a public health crisis more severe than any seen for a hundred years"), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam); *United States v. Hernandez*, 451 F. Supp. 3d 301, 303 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . presents a clear and present danger to free society for reasons that need no elaboration.").

On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020). Two days later, on

---

[8] It is not uncommon for this Court to grant a defendant who is on pretrial release 60 days to report to the BOP.

[9] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (accessed Oct. 19, 2023).

March 13, 2020, President Trump declared a national emergency. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P. That declaration was extended on several occasions. *See, e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).[10]

In April 2020, when defendant was due to report to the BOP, Maryland, like the rest of the country, was in "a state of emergency." *Seth*, 461 F. Supp. 3d at 248. Moreover, correctional facilities were especially vulnerable to viral outbreaks. *See Coreas v. Bounds*, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."). At the relevant time, the only known way to slow the spread of the virus was to practice "social distancing" and use masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://perma.cc/9YAY-Z9JU (accessed May 21, 2020). But, social distancing was particularly difficult in the penal setting. *Seth*, 451 F. Supp. 3d at 249. Prisoners had little ability to isolate themselves from the threat posed by the coronavirus, nor could they easily procure their own health supplies. *See United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").

---

[10] By May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life." Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://perma.cc/8C8P-7PU4 (accessed Oct. 16, 2023).

The defendant, who was then 55 years of age, had a long history of smoking; he was obese; and he had coronary artery disease. *See, e.g.*, ECF 353-1; ECF 353-2. According to the Centers for Disease Control and Prevention ("CDC"), obesity, with a Body Mass Index ("BMI") of 30 or higher, as well as smoking and serious heart conditions, are among the factors that increase the risk of severe illness due to COVID-19.[11]

Because of the gravity of the pandemic, and the challenges faced by penal institutions in managing the spread of the virus, this Court granted numerous defense requests for extensions of defendant's self-surrender dates.[12] *See, e.g.*, ECF 272 (Order of March 23, 2020); ECF 281 (Order of April 30, 2020); ECF 319 (Order of June 24, 2020); ECF 325 and ECF 326 (Memorandum and Order of July 29, 2020); ECF 329 (Order of September 2, 2020); ECF 334 and ECF 335 (Memorandum and Order of September 25, 2020); ECF 345 and ECF 346 (Memorandum and

---

[11] The CDC provided an extensive list of medical conditions that could exacerbate a COVID-19 infection. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8. These include comorbidities such as cancer, chronic kidney disease, chronic liver disease, chronic lung diseases, cystic fibrosis, dementia or other neurological conditions, diabetes (type 1 or type 2), heart conditions, HIV infection, immunocompromised condition or weakened immune system, mental health conditions, obesity, physical inactivity, pregnancy, sickle cell disease or thalassemia, smoking, solid organ or blood stem cell transplant, stroke or cerebrovascular disease, substance abuse disorders, tuberculosis, disabilities such as one that "makes it more difficult to do certain activities or interact with the world around them," cerebral palsy, birth defects, attention-deficit/hyperactivity disorder, intellectual and developmental disabilities, learning disabilities, spinal cord injuries, and people with Down syndrome.

The CDC also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

[12] The Court granted extensions to other defendants, as well. And, on at least one occasion here, the government consented to defendant's extension request. *See* ECF 280.

Order of November 5, 2020); ECF 355 and ECF 356 (Memorandum and Order of November 25, 2020); ECF 361 and ECF 362 (Memorandum and Order of January 6, 2021).

The defendant eventually began his prison sentence at FCI Loretto on February 3, 2021. ECF 367, ECF 369. He has served more than four and a half years of his sentence. Defendant, who is currently incarcerated at Butner Low FCI in North Carolina, has a projected release date of November 13, 2033. *Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/ (search by BOP Register Number 64658-037) (last accessed August 28, 2025).

## II.    Trial Summary[13]

In the early hours of July 29, 2015, the Baltimore City Fire Department ("BCFD") responded to a warehouse fire at Adcor, located at 234 South Haven Street in Baltimore. At the relevant time, Adcor manufactured precision and mechanical parts for beverage and aerospace companies, as well as parts for the firearms and defense industries. The Adcor building, a two-story commercial structure, also housed related business entities owned by the defendant. I shall refer to these entities collectively as "Adcor."[14] The building itself is owned by TJ Enterprises, LLC, which is also owned by the defendant.

---

[13] The factual summary derives, in part, from my Memorandum Opinion of February 7, 2020 (ECF 247), in which I addressed defendant's Motion for Judgment of Acquittal (ECF 229). As noted in that Memorandum Opinion, I prepared the factual summary in that opinion on the basis of my notes from trial as well as the parties' submissions, because trial transcripts were not yet available. In the Fourth Circuit's opinion of February 24, 2022 (ECF 395-1), upholding the defendant's convictions, the Court observed that my opinion of February 7, 2020 (ECF 247) "sets out in detail the extensive evidence at trial." ECF 395-1 at 5. Therefore, in its opinion, the Court "recount[ed]" the evidence "only briefly." *Id.*

I also draw here on the factual summary in my Memorandum Opinion of July 3, 2024 (ECF 440). In that opinion, I denied defendant's § 2255 Petition (ECF 406). And, I have relied on the facts set forth in the government's submission at ECF 407.

[14] At trial, Michael Young, a certified public accountant and partner at a public accounting firm, testified that Adcor had been a client of the accounting firm since 2006. He explained that

Adcor is bordered, in part, by Gough Street and Grundy Street. Jose Romero was on Grundy Street in the early morning of July 29, 2015. He saw smoke coming from the Adcor building at approximately 1:30 a.m. and called 911. The BCFD extinguished the fire by approximately 1:50 a.m. No one was injured in the blaze.

The Adcor building contains a secured area, known as the Gun Room. It also houses a large machine shop and warehouse, with several bay doors for trucks. Within the warehouse is an enclosed office known as the DNC Hut, which measures approximately ten feet by twelve feet in size.

The fire originated in the DNC Hut. Although there was little of value that was stored in the DNC Hut, the room itself was destroyed. Other parts of the Adcor premises experienced substantial smoke and water damage. After the fire, a five gallon drum of methanol, in charred condition, was found in the DNC Hut. It was undisputed that the methanol was used to ignite the fire. Prior to the fire, that can of methanol had been stored in the beverage shipping area of the Adcor warehouse. It was the only can of methanol stored at Adcor. Shop foreman William "Bud" Kuhrmann used the methanol on a limited basis.

At trial, Special Agent Lisa Herb of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") explained that The National Fire Protection Association ("NFPA") lists four classifications of fire: accidental (*e.g.*, pot on stove); natural (*e.g.*, lightening); undetermined; and incendiary, *i.e.*, arson. It is undisputed that the fire at Adcor was the result of arson.

As to arson, the NFPA identifies six motives. They are vandalism, excitement, crime concealment, revenge, profit, and extremism.

---

the defendant owned 100% of Adcor. And, Adcor owned 100% of three other businesses and had a 50% ownership interest in another.

As indicated, Adcor's insurer, Travelers, paid over $15 million in insurance benefits.  Of the $15 million in insurance proceeds, only about $600,000 was used for building restoration. Most of the money was used to replace or restore machinery and equipment.

No direct evidence was adduced at trial to establish that the defendant was the torch. Rather, the government's case was largely circumstantial.

The government's evidence focused, *inter alia*, on the two glass doors at the front entrance to Adcor.  There was no sign of forced entry into the Adcor building.  And, nothing of value was taken from the premises.

The front office doors had three security features.  First, there was a dead bolt, operated with a key, located towards the top of the door.  In July 2015, only a few employees had a key for the deadbolt:  the defendant; Michael Hyatt, the general manager of Adcor; William "Bud" Kuhrmann, the shop foreman; and four others.  However, the tumbler was not working in July 2015, so the door could not be unlocked with a key.

Second, there was an electrified, magnetized lock on the front door, manufactured by Brivo.  It was connected to a security feature that enabled the lock to open from the outside by bringing a security card near a reader located to the left of the exterior doors.  The security card resembled a credit card.  From the inside, the Brivo lock was unlocked by using a paddle that was placed on the lower left-hand side of the door.  There was also a button by the reception desk on the second floor of the office that could allow the door to open.

All Adcor employees were provided with a security card to operate the lock on the door. Each card was linked to a unique number assigned to that employee.  As noted, an Adcor employee could swipe his or her security card to unlock the front door.  If the swipe card was used to enter

the building, a record was made that reflected the identity of the person who swiped in with the Brivo card, as well as the date and time of use of the Brivo card.

Third, the front doors were equipped with a security alarm, for which an interior alarm keypad was located nearby. That keypad was one of three for the entire building. The keypad was used to arm and disarm the alarm by way of a four-digit code.

An entrant had a 30-second grace period to disarm the system by way of the keypad before activating the alarm. When leaving and arming the system "away," using the keypad, the alarm provided a 60-second grace period to leave before it would trigger an alarm. But, if an exterior door sensor did not make proper contact, the system would not arm the alarm and would display a message at the keypad that indicated the system was not ready, along with a code to identify the zone where the sensor was not in contact.

In July 2015, the employees who knew the alarm code all shared the same alarm code. The defendant knew the alarm code. Each user of the alarm code was identified as "User 3" in the alarm records.

The areas of the building covered by the alarm were designated as "partitions." The front lobby area, adjacent to the glass doors, was called Partition One. The warehouse was designated as Partition Two. There was also a motion sensor in the lobby.

Alarm services were provided by Protection One. Review of the alarm records showed infrequent maintenance calls prior to the fire on July 29, 2015.[15]

At the time of the fire, Adcor also had eleven security cameras. Eight were interior cameras and three were exterior cameras. The video surveillance system was motion-activated and

---

[15] After the fire, Protection One was asked to download information from the panel, and then in August 2015, the alarm panel was removed at the request of Travelers Insurance. After that work was done, the next call for service did not occur until March 2017.

recorded for seven days. This meant that it only recorded when it sensed movement. And, it maintained recordings for a period of seven days, deleting the oldest day as it recorded the current day.

Betsy Robak joined Adcor in May 2009. She worked in accounting. On July 28, 2015, Robak left the building at 5:51:08 p.m. On that day, she was the last office employee to leave Adcor, other than the defendant. Mr. Stavrakis had asked Robak to join him for drinks at the Blue Hill Tavern, a restaurant in Baltimore that he co-owned. Although Ms. Robak had worked at Adcor since 2009, she had never previously had drinks alone with the defendant. She had, however, previously been to the Blue Hill Tavern with the defendant as part of a group of Adcor employees.

The government introduced video surveillance evidence obtained from Adcor security camera No. 1. It showed the defendant at Adcor's main entrance doors at 5:52:06 p.m. on July 28, 2015, about one minute after Robak left the building. In particular, the video showed the defendant applying tape to the Brivo latch of the front door before he set the security alarm.

At 5:52:19 p.m., after the defendant had applied the tape, he set the security alarm by using the alarm keypad near the front doors. He then exited the building through the main doors. However, he returned a few seconds later, at 5:53:17 p.m. He entered by pulling open the front door without swiping his Brivo security card. In other words, by taping the door, the defendant defeated a security feature that would have identified the person opening the door. He then turned off the security alarm. Thereafter, defendant removed a roll of tape from his pocket and applied additional tape to the same area of the front door. Then, he activated the alarm for a second time, at 5:54 p.m., and left the building for the second time. *See* ECF 407 at 5–6 (showing photographs from the security camera).

The Brivo records, which record activity at the front office doors as "Office Door," do not indicate card reader activity for this time. According to the government, this indicates that, in taping the Brivo electrified latch, defendant "effectively defeated this security feature." ECF 407 at 6. Moreover, when the defendant reentered the building after the initial taping, he did not use the Brivo swipe pad. The government claims that this, too, established that "the electrified latch had been defeated.[]" *Id.* Thereafter, defendant met Robak at the Blue Hill Tavern.

Several Adcor witnesses testified that they were unfamiliar with any problem with Adcor's front entrance doors that would cause difficulty in being able to set the alarm. Others testified to the contrary. *See*, *e.g.*, ECF 232-1. But, there was no evidence of any prior use of tape to fix any issue with Adcor's front entrance doors.

According to the evidence, office personnel generally were not responsible for activating the alarm at the end of the work day. Rather, the nightshift supervisor was responsible for doing so. Therefore, when Mr. Stavrakis left the building on the evening of July 28, 2015, it was unusual that he activated the alarm. And, when the defendant left the Adcor premises on July 28, 2015, two machinists were on the shop floor. In particular, Richard Glendenning and Edward Thomas were working the 3:00 p.m. to 11:00 p.m. shift.

Thomas had been asked to close the building on the night of July 28, 2015. He testified that he never experienced any issues with the front office doors or the alarm in the many years that he worked at Adcor and secured the building as part of the close-up procedure.

At about 5:00 p.m., Thomas noticed the defendant looking out of an interior office window, which overlooked the shop area. At about 7:00 p.m., after the lights had been turned off in the office area, Thomas entered the lobby of the office area, near the front doors, with the intention of ensuring that the front doors were secured. To his surprise, he set off the motion detector that

covered much of the lobby area.[16]  The activation of the alarm was documented by records for the security system.  After Thomas set off the alarm, he disarmed it at 7:02 p.m.  To do so, he used the keypad near the front doors.  He then rearmed the office, designated as Partition One.  However, he did not arm the shop area, designated as Partition Two, until he and his coworker left the building for the night.  They exited through a shop door.  The system recorded their departure at 11:16 p.m.

There is no record of a swipe card having been used to enter through the front doors of the Adcor building on the morning of July 29, 2015, prior to the fire.  Nor was there any video surveillance footage of anyone entering the building through the front lobby doors prior to the fire.  But, at 12:25 a.m. on that date, Partition One was disarmed using the four digit code.  The shop floor, Partition Two, was disarmed several minutes later, at 12:33 a.m., with the same code.

Anthony J. Cianferano, Jr., a Baltimore City firefighter, was one of the first responders to arrive at the scene.  He arrived at Adcor between 1:40 a.m. and 1:45 a.m.  He testified that the lights were on in the hall/foyer as he approached the two front doors from the inside of the building.

The Brivo records show that the last event on July 28, 2015, occurred at 9:08 p.m.  That is when Thomas used his Brivo card to access the "Shop Front Door."  The first use of Brivo card access on July 29, 2015, occurred at 3:03 a.m., when the defendant accessed the "Gun Room," along with Detective Michael Reno of the Baltimore City Police Department ("BPD").  The defendant was at home when he was notified of the fire.  He arrived at Adcor just before 3:00 a.m. on July 29, 2015.  His cell phone did not link him to the Adcor premises at the time of the fire.

After the defendant learned of the fire, one of the first calls he made, at approximately 4:11 a.m., was to Randolph ("Randy") Goodman, a public adjuster and a principal with the firm

---

[16] Because of a masking feature, Security Camera 1 did not capture the entire lobby area.

Goodman-Gable-Gould/Adjusters International.[17]    According to the evidence, a public adjuster helps navigate the insurance claim process and assists an insured in maximizing the insured's recovery in accordance with the terms of the applicable insurance policy.  As noted, Adcor was insured through Travelers.

Agent Herb was notified of the fire by Detective Reno.[18]  Reno arrived at Adcor at about 2:00 a.m. on July 29, 2015.  Herb arrived at Adcor at about 4:00 a.m.  Among other things, she spoke with the defendant, who was already at the scene.  In response to Herb's inquiry, the defendant identified two former, disgruntled employees, one of whom was Michael Brown.

On July 29, 2015, Agent Herb interviewed the defendant.  Stavrakis told Agent Herb that all the windows and doors were locked and secured at the time of the fire.  When asked about the five gallon drum of methanol found in the DNC Hut, the defendant indicated it was not normally stored in that area.  Agent Herb also asked the defendant who secured the building and set the alarm on July 28, 2015, prior to the fire.  Defendant advised that he would not be the person to secure or lock the front doors, and that he would not set the alarm, because that was not something that he would do.

Notably, the defendant did not disclose to Agent Herb that he had taped the front door that night because it was malfunctioning.  Moreover, there was no evidence that anyone other than the defendant knew of the tape on the front door.  And, as of 4:39 a.m., there was no tape on Adcor's front entry door, as reflected in a photograph of the front door that Agent Herb took at that time.

---

[17] The Court did not permit the government to introduce evidence of a fire in 2007 at another building associated with the defendant, for which a substantial insurance claim was paid, and with respect to which Mr. Goodman assisted the defendant.

[18] Reno retired from the BPD in June 2019, after 25 years of service.

Agent Herb asked Adcor senior employee Michael Hyatt to provide video surveillance for a 24-hour period surrounding the fire. Hyatt began working at Adcor in 1997, at the age of 19. By 2015, he held the position of Vice President and was regarded as the number two person at Adcor. He was also in charge of "IT." And, he is a close associate of the defendant.

During the day on July 29, 2015, Detective Reno watched surveillance video footage that appeared to depict a human figure igniting the fire. And, on the afternoon of July 29, 2015, Hyatt furnished a disk with the video surveillance to law enforcement. It covered the period from 4:00 a.m. on July 28, 2015, through 8:00 a.m. on July 29, 2015. Agent Herb did not review the video at that time, however. And, it was later determined that the disk did not contain footage of activity at the front doors or lobby between 12:25 a.m. and 12:33 a.m. on July 29, 2015. There was also a gap in footage for Security Camera 1 from 6:00 p.m. on July 28, 2015, to 2:00 a.m. on July 29, 2015. Therefore, the video did not depict employee Thomas setting off the security alarm at about 7:00 p.m. on July 28, 2015.

Hyatt denied that he deleted anything. He explained that if any file was created and not provided, the only explanation was that someone physically removed that file from the server, which could be done from any computer on the network.

As of July 30, 2015, neither Travelers nor law enforcement had requested production of the actual hard disk drives. A few days after the fire, Travelers requested the actual hard disk drives. But, Adcor was unable to produce the two hard disk drives that stored the relevant video surveillance footage, as requested by Travelers. According to Hyatt, on July 30, 2015, the server crashed, so he replaced the hard disk drives and left the old ones on a table near the server, located in a second-floor office. But, they were never found. The cleaning and restoration crews working at Adcor denied disposing of any Adcor property.

18

The parties stipulated that Travelers recovered 10 hard disk drives from an office area of Adcor on September 11, 2015. They were "loose," that is, they were "not currently installed in any server or computer." *See* Government Trial Exhibit 120.

On Monday, August 3, 2015, while Hyatt was on vacation with his family at a beach in North Carolina, ATF Task Force Officer ("TFO") Dexter Hodges asked Hyatt for the hard disk drives. And, on August 6, 2015, TFO Hodges showed up at Hyatt's beach place, without having told Hyatt that he would do so.

ATF Specialist Steve Greene, a digital forensic analyst, was received as an expert. He opined that if the hard disk drives had been available for inspection, he would be able to determine if any files had been deleted.

James McKinnies, a Certified Fire Investigator and Special Agent with ATF, took numerous photographs at Adcor on April 3, 2019. He also inspected the roof hatch by gaining access to the roof through the kitchen on the second floor. He noted that there is no handle on the outside of the hatch, *i.e.*, on the roof side.

Douglas Fisher, a Fire Protection Engineer with more than two decades of experience, visited Adcor on August 3, 2015, and again on August 28, 2015, on behalf of Travelers. Among other things, he examined Adcor's security and surveillance systems. The company did not have a fire suppression system. By the time Fisher returned to Adcor in late August of 2015, less than a month after the fire, Adcor's front doors had been replaced. Moreover, the doors that supposedly malfunctioned on July 28, 2015, had been discarded by Adcor and thus could not be examined. According to Fisher, only two of Adcor's eleven security cameras were damaged due to the fire.

Eric Huzzy, an insurance restoration contractor retained by Travelers, was at Adcor on several occasions, beginning soon after the fire. He photographed the roof hatch and also noted

that the access handle is located on the interior of the hatch, inside the building.  Huzzy found it surprising that the front office doors had been replaced by Adcor without Adcor first obtaining permission from Travelers.

Michael Brown joined Adcor in 2000.  Brown's wife, his father, and his two sons also worked at Adcor at varying times.  They all left employment with Adcor on the same date in September 2013.  The departure was not amicable.

After the fire, the defendant implicated Brown by way of statements he made to Agent Herb and TFO Hodges.  Similarly, Fisher attended an interview of the defendant on August 28, 2015, and noted that the defendant discussed Brown and his wife and referenced a disparaging matter involving Ms. Brown.  And, Goodman testified that the defendant told him that a disgruntled employee named Brown may have started the fire.

Mr. Brown and his wife both testified for the government.  Electronic evidence showed that Mr. Brown was at his home at the time of the fire.  And, Brown denied any wrongdoing.

According to Brown, he developed about 30 patents that are owned by Adcor.  Brown also explained that, from approximately 2005 to 2010, Adcor made upper receivers for Colt's M-4 weapons.

Brown recounted that he had been close with the defendant for many years.  But, by the time of Brown's departure in 2013, his relationship with the defendant had deteriorated.  In fact, in 2014, the defendant sued Brown, claiming Brown misappropriated intellectual property that belonged to Adcor.  The case eventually settled.

Further, Brown testified that at 2:19 a.m. on July 29, 2015, he learned of the fire from the police.  He recalled that he went to the scene later in the day, because he and his family were going to dinner in that area for his son's birthday.  He also claimed that until September 2019, he was

unaware of any rumors concerning his wife's alleged indiscretion with an Adcor employee. It was one of the prosecutors who told him of the "rumor."

Brown was familiar with the roof hatch at Adcor. He maintained that it could not be opened from the outside.

Of import, the evidence established serious issues regarding Adcor's financial circumstances at the relevant time. The government claimed that defendant's actions were motivated by Adcor's dire financial circumstances. *See* ECF 462 at 4. According to the government's evidence, consisting of records and the testimony of numerous witnesses, Adcor suffered total operating losses of over $7.6 million between 2010 and June 2015, and from January to June 2015, it had a six-month operating loss of $718,679.13. Moreover, Adcor was repeatedly in default as to various loans, necessitating forbearance agreements with several lenders at varying times, including M&T Bank; JOCO Financial, LLC; 1st Mariner Bank; and Bank of America. In addition, Adcor employees and suppliers testified that between 2012 and July 2015, Adcor failed to make timely payments to several suppliers.

The defendant personally borrowed over $5 million, and used some of the money to repay loan obligations. Defendant defaulted on the loan. To satisfy debt obligations, Adcor also sold its Beverage Division, which was profitable, to Adcor Packaging Group, of which the defendant owned only 50%.

As noted, two of Adcor's surveillance cameras had been damaged during the fire. Hyatt testified that the defendant asked him to obtain bids for Adcor's security system. Hyatt obtained a bid from Strat Security, which Hyatt described as "a little bit of an upgrade." The defendant personally met with Strat Security about the bid. Hyatt sent the bid from Strat Security to Goodman via email on September 14, 2015, and copied the defendant on the email. In the email,

Hyatt asked "how to proceed." He testified that he was not aware that the bid he sent to Goodman would be forwarded to Travelers.

Travelers conducted an Examination Under Oath ("EUO") of the defendant on October 21, 2015. The transcript was read to the jury and a short excerpt of the audio was played. At the EUO, the defendant claimed that the "throat was broke" on Adcor's front entrance door when he left the building on July 28, 2015. For that reason, he taped it. Mr. Stavrakis explained that he set the alarm but he then disarmed the alarm because it was not properly set, and then he rearmed it. Further, he stated that he happened to have the tape with him because he was doing grout work at home.[19]

According to the defendant, the problem with the door was a recurring issue. He claimed that the door would stick whenever he tried to set the alarm.

The government asserts, ECF 407 at 10:

> Clearly, the arsonist: (1) had a key to the front door deadbolt; (2) knew the tape was placed to defeat the Brivo electrified latch/swipe card system; (3) knew the 4-digit alarm code; (4) knew the layout of the building and where the keypads were located; (5) knew where the methanol was stored; and (6) knew where the DNC Hut was located. To enter the building, disarm the alarm, locate the methanol, and then proceed to the DNC Hut in a large and darkened warehouse, even with the aid of a flashlight, required someone with a great deal of familiarity of the layout of ADCOR.

Moreover, the government claims that defendant gave a false statement at his EUO. It states, in part, *id.* at 16–18:

> This explanation was false for several reasons:
>
> a.     As indicated earlier, the defendant taped the door before attempting to set the alarm for the first time.

---

[19] As noted, the video showed that the defendant taped the door before attempting to arm the alarm. And, when the defendant re-entered the building, he was able to open the door without swiping his Brivo card.

b.      The defendant *was* able to set the alarm, which he would not have been able to do if the front doors were not properly closed and making contact with the sensors.  (Emphasis in original; citation omitted).

c.      The fact that he taped the front door to defeat the need to swipe in is clearly indicated on the video as he was able to pull the door open without swiping in when he re-entered.

d.      The defendant was the owner of the business, and there was testimony at trial that he occasionally opened and closed the office, including when he worked on weekends.  [Citation omitted].  As such, the defendant would have been fully aware of the operation of the alarm system, including the sounds it made. The defendant therefore could not have misconstrued the normal customary, sound of the alarm activation to mean that there was a problem with the alarm.

e.      Of the twenty-two Adcor employees who testified at trial, only six noted any problem whatsoever with the front office doors, let alone a chronic recurring issue as the defendant described during the EUO.  Four individuals (Robak, Brown, Kuhrmann, and Glendenning)[] noted that on rare occasions prior to the fire, the front office doors were not closed sufficiently to bring the sensors on the front doors into contact, which would prevent the alarm from being set. . . .

Kuhrmann, the shop foreman, never experienced this problem personally in the five years he used the front doors prior to the fire, but it was brought to his attention on two occasions prior to the fire.

*      *      *

f.      Not one of the twenty Adcor employees who were asked at trial about tape and the front doors ever recalled seeing tape in the area of the latch on the front office doors, or ever even hearing/discussing taping the front office doors.

Ultimately, as mentioned, Travelers paid approximately $15 million on the Adcor insurance claim.  The insurance money was used to replace several old machines at Adcor with new, state of the art equipment that cost almost $2 million.  In addition, the defendant transferred about $600,000 to an account in his wife's name.  The money was also used to pay off private loans procured before the fire.  And, between August and December of 2015, the defendant made several purchases of personal property, such as a BMW for almost $53,000; a Harley-Davidson

motorcycle for Adcor employee Bud Kuhrmann for $25,500; a Mercedes-Benz sport utility vehicle for almost $100,000; a men's $15,000 Rolex watch for Adcor's second in command, employee Mike Hyatt; a ladies' diamond ring for $12,500; and a men's watch for $7,800.  And, in December 2015, defendant paid two of his employees the sum of $10,000.

### III.    The Legal Standard

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Moody*, 115 F.4th 304, 310 (4th Cir. 2024); *United States v. Davis*, 99 F.4th 647, 653 (4th Cir. 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

A statutory exception is codified at 18 U.S.C. § 3582, which was first enacted as part of the Sentencing Reform Act of 1984.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  It is commonly termed the "'compassionate release exception.'"  *Moody*, 115 F.4th at 310; *see United States v. Osman*, 2024 WL 3633573, at *3 (4th Cir. Aug. 2, 2024) (per curiam) (stating that a motion under § 3582(c)(1)(A) is "commonly referred to as a motion for compassionate release . . . .").  Specifically, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a court, in its discretion, to

reduce a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction,"; "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and the court has considered the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Crawley*, 140 F.4th 165, 169 (4th Cir. 2025); *Hargrove*, 30 F.4th at 194.

As originally enacted, the compassionate release provision permitted a court to alter a sentence only upon motion made by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).  However, the safety valve of § 3582 languished, because the BOP rarely filed such a motion on an inmate's behalf.  As a result, compassionate release was an infrequent occurrence.  *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In 2018, with the passage of the First Step Act, *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)), Congress "broadened" the authority of courts to grant sentencing modifications pursuant to 18 U.S.C. § 3582.  *Malone*, 57 F.4th at 173.  In particular, the FSA authorized a court to grant compassionate release "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf

or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A); *see also Ferguson*, 55 F.4th at 268; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *United States v. McCoy*, 981 F.3d 271, 283 (4th Cir. 2020). In other words, a federal inmate is now able to file a motion for compassionate release directly with the court, as long as the inmate first exhausts administrative remedies. *See McCoy*, 981 F.3d at 283.[20]

It is undisputed that Stavrakis submitted a request for a reduced sentence to the Warden of FMC Butner on May 21, 2024. His request was denied on June 14, 2024. *See* ECF 458-3. Therefore, defendant has exhausted his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A). Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are satisfied. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831.[21] Specifically, "the district court must conduct a two-step analysis." *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024); *see also Bond*, 56 F.4th at 383.

The first step consists of two parts. The court "must determine: (1) whether extraordinary and compelling reasons warrant . . . a [sentence] reduction; and (2) that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Malone*, 57 F.4th at 173; *see Moody*, 115 F.4th at 310; *Davis*, 99 F.4th at 654; *Bond*, 56 F.4th at 383-84; *Bethea*, 54 F.4th at 831; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam),

---

[20] If a defendant has already exhausted administrative remedies upon filing a first motion for compassionate release, the defendant does not need to meet the bar for exhaustion a second time, should the defendant seek to renew the motion. *United States v. King*, 2025 WL 1692747, at *1 (4th Cir. June 17, 2025) (per curiam).

[21] The Fourth Circuit has said that there are two criteria, and that the first criterion consists of two steps. *See*, *e.g.*, *Malone*, 57 F.4th at 173. More recently, however, in *Crawley*, 140 F.4th at 169, the Fourth Circuit stated that there are three criteria. Whether the criteria are counted as two or three, the substance is the same.

*cert. denied*, 142 S. Ct. 383 (2021). The court's analysis of these two steps goes hand in hand. *United States v. Burleigh*, 145 F.4th 541, 547 (4th Cir. 2025). If that first step is met, the court then proceeds to the second step.

Under the second step, the court must determine whether release is appropriate in light of the sentencing factors in 18 U.S.C. § 3553(a), "to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see Moody*, 115 F.4th at 310; *Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647; *Kibble*, 992 F.3d at 331. "Importantly, a court assessing a compassionate release motion is entitled to consider the § 3553(a) factors '[o]nly after' conducting the first step's analysis." *Osman*, 2024 WL 3633573, at *3 (citations omitted) (alteration in *Osman*); *see Malone*, 57 F.4th at 173 (stating that the district court may consider the § 3553(a) sentencing factors only after determining that extraordinary and compelling reasons warrant a sentence reduction and that a reduction is consistent with the Sentencing Commission's policy statements).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647. Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see United States v. Gutierrez*, 2023 WL 245001, at *5 (4th Cir. Jan. 18, 2023) (unreported); *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.

As the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Davis*, 99

F.4th at 654. However, if there is no applicable policy statement relating to the defendant's compassionate release motion, the court has discretion to make its "own independent determination of what constitutes an extraordinary and compelling reason under § 3582(c)(1)(A)." *Burleigh*, 145 F.4th at 548 (cleaned up); *see also United States v. Johnson*, 143 F.4th 212, 215 (4th Cir. 2025) (explaining that, "[i]n the absence of an applicable policy statement, district courts" have the power to "consider *any* extraordinary and compelling reason for release") (cleaned up).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). "[U]ntil recently," that Policy Statement did not apply to motions filed by prisoners. *Davis*, 99 F.4th at 654; *see McCoy*, 981 F.3d at 281. The Policy Statement began: "Upon motion *of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2021) (emphasis added). Interpreting this language, the Fourth Circuit said in *McCoy*, 981 F.3d at 282, that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, . . . § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *Id.* at 281 (citation omitted). As a result, district courts were "'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted) (emphasis in original).

Effective November 1, 2023, U.S.S.G. § 1B1.13 was amended. *See Davis*, 99 F.4th at 654 (citing 88 Fed. Reg. 28254 (May 3, 2023)). The Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added).

28

The Policy Statement is applicable to defendant-filed motions under § 3582(c)(1)(A). *Davis*, 99 F.4th at 658 (directing district court on remand "to revisit [the petitioner's] arguments in light of the Sentencing Commission's new policy statement outlining when and how to consider changes in law as an extraordinary and compelling reason for a reduction").  Moreover, a court should apply the Policy Statement that is applicable "at the time the court renders its decision," not at the time the motion is filed. *Crawley*, 140 F.4th at 170.  When a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).

The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

(B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

    (1) (A) extraordinary and compelling reasons warrant the reduction; or

    (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

    (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

    (3) the reduction is consistent with this policy statement.

Section 1B1.13(b) of the Policy Statement is titled "EXTRAORDINARY AND COMPELLING REASONS."  It identifies multiple circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *See* § 1B1.13(b)(1)–(6).  These include certain medical circumstances of the defendant, such as a terminal illness, "serious . . . cognitive impairment," a medical condition that requires "specialized

medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or the defendant is at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public health emergency . . . .", § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, along with other factors, § 1B1.13(b)(2); the defendant's family circumstances, § 1B1.13(b)(3)(A), (B), (C), (D); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer, § 1B1.13(b)(4)(A), (B); and for a defendant who received an "unusually long sentence" and has served at least 10 years of the sentence, a non-retroactive change in the law that "produce[s] a gross disparity" in relation to "the sentence likely to be imposed at the time the motion is filed . . . .", § 1B1.13(b)(6). In deciding whether a defendant has met the ten-year requirement, district courts can only consider the time a defendant has served in prison and cannot adjust that amount with good-time credits. *Crawley*, 140 F.4th at 172–73.

Section 1B1.13(b)(5) is titled "Other Reasons." Under § 1B1.13(b)(5), the district court may consider "any other circumstance or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." The capacious language in § 1B1.13(b)(5) underscores that the enumerated circumstances listed in the Policy Statement are not an "exhaustive list" of extraordinary or compelling reasons. *Johnson*, 143 F.4th at 216. For example, in *Johnson*, the Court affirmed a district court's decision to reduce a defendant's sentence based on the disparity between the defendant's sentence and those of his co-conspirators. *Id.* at 215–16.

Section 1B1.13(c) of the Policy Statement is titled "LIMITATION ON CHANGES IN LAW." It specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has

not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." U.S.S.G. § 1B1.13(c). "However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Id.*; *see Davis*, 99 F.4th at 654.[22]

Section 1B1.13(d) of the Policy Statement concerns rehabilitation of the defendant. It limits the weight a court may assign to a defendant's rehabilitation while serving a sentence. That section provides that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13(d). "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.* And, § 1B1.13(e) provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction.

Even if a defendant prisoner establishes that extraordinary and compelling reasons warrant relief, a reduced sentence does not necessarily follow. The court must then consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence

---

[22] In *Concepcion v. United States*, 597 U.S. 481 (2022), the Supreme Court concluded that a district court's general obligation "to consider [all] nonfrivolous arguments presented by the parties," *id.* at 487, required it "to consider intervening changes of law or fact in exercising [its] discretion to reduce a sentence pursuant to the First Step Act." *Id.* at 500. However, the Court acknowledged that "Congress or the Constitution [may] limit[ ] the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence...." *Id.* at 486-87. "Thus," the Court noted, "Congress expressly cabined district courts' discretion [to reduce a sentence] by requiring courts to abide by the Sentencing Commission's policy statements." *Id.* at 495.

is appropriate. *See Dillon*, 560 U.S. at 826–27; *Brown*, 78 F.4th at 128; *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion). Notably, the amendments to the Guidelines in November 2023 did not alter this requirement.

The § 3553(a) "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)). Additionally, the court may consider the "'kinds of sentences available,' and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Burleigh*, 145 F.4th at 548

(quoting 18 U.S.C. § 3553(a)(1), (3), (6)). As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 F.3d at 500). The district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor." *Davis*, 99 F.4th at 656; *see United States v. Friend*, 2 F.4th 369, 381–82 (4th Cir. 2021). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

In *Davis*, 99 F.4th at 659, the Fourth Circuit said: "District courts are not required to acknowledge and address each of the defendant's arguments on the record when conducting a § 3553(a) analysis." But, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also Davis*, 99 F.4th at 659; *United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

In particular, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190).

It is "not difficult" for a district court to satisfy this standard. *Burleigh*, 145 F.4th at 550. However, a more detailed explanation may be required if a substantial change in the law creates a disparity between the sentence a defendant actually received and the sentence he would receive, if sentenced under current law. *See Davis*, 99 F.4th at 661; *see* 18 U.S.C. § 3553(a)(6) (directing a court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."); *see Moody*, 115 F.4th at 312-13 (recognizing that a defendant may not "challenge the validity of a sentence in a compassionate

release" motion but explaining that a court may consider whether a defendant's sentence would be shorter "because of changes in law"). In explaining its compassionate release ruling, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors . . . ." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

A district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).

Of course, the district court's "discretion is not boundless." *United States v. Smith*, 2025 WL 1864767, at *3 (4th Cir. July 7, 2025) (unreported). And, "in exceptional case[s]" the district court can abuse this discretion either by neglecting to "adequately explain how it weighed the § 3553(a) factors" or by "failing to recognize that the relevant § 3553(a) factors clearly favor release." *Id.* (alteration added); *see id.* at *4 (finding that the district court abused its discretion by failing to acknowledge how the "multiplicity of factors combine to make the case for compassionate release").

"How much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

*Davis*, 99 F.4th 647, is informative. There, the Court recognized that a change in the

Guidelines or the law can produce a sentencing disparity under § 3553(a)(6). *Id.* at 654–55. And, the Court observed that changes in the law since the defendant's sentencing "would [have] lower[ed] [the defendant's] guidelines range from a 188–235 months range to [a] 92–115 months range." *Id.* at 661.

According to the *Davis* Court, if the defendant were sentenced under current Guidelines, "it is very likely that [the defendant] would already be out of prison." *Id.* The Court stated, *id.*: "That reality alone implicates one of the applicable sentencing factors: 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id.* (quoting 18 U.S.C. § 3553(a)(6)). It concluded that the district court was obligated to provide a "detailed explanation" of its § 3553(a) analysis, because "[t]his sentence disparity is so stark, and the change in law so substantial." *Davis*, 99 F.4th at 661 (citing *Chavez-Meza v. United States*, 585 U.S. 109, 119 (2018)). As the *Burleigh* Court cautioned, even if a defendant's sentence "would be shorter if issued today," this fact does "not increase the burden on district courts to explain their decision." *Burleigh,* 145 F.4th 550–51.

## IV.    Defendant's Health Conditions

Stavrakis has several significant health conditions. At sentencing, the Court was aware of defendant's hip replacements, high cholesterol, hypertension, and gout. ECF 237 (Defense sentencing memorandum), at 5; ECF 257, ¶¶ 76, 77.[23]

After sentencing, but before defendant began his incarceration, the Court was informed of additional health issues, some of which had only recently developed. For example, in May 2020,

---

[23] The government asserts that the Court already considered defendant's health conditions at sentencing. ECF 462 at 2, 18. Defendant's health conditions have changed since sentencing. But, even so, this argument has little merit. Because of the mandatory minimums applicable here, the Court could not reduce the defendant's sentence below fifteen years, regardless of his health conditions.

defendant suffered a partial tear of his Achilles tendon.  *See*, *e.g.*, ECF 315 at 2; ECF 315-1; ECF 315-2; ECF 315-3; ECF 315-4.  The Court also learned that defendant has coronary artery disease. ECF 322 at 3.  Testing on September 30, 2020, revealed that defendant had a coronary calcification score of over 4000.  ECF 330-1; *see* ECF 330 at 2.  This supported the claim of coronary artery disease.  *See* ECF 342.  Then, in November 2020, defendant underwent coronary artery angiography/catherization.  ECF 353-1.  According to Daniel Collector, M.D., defendant's treating physician, this test confirmed that defendant has coronary artery disease.  ECF 353-2.  Dr. Collector placed defendant at an "'extremely high risk, in the near future, of either heart attack or stroke'. . . ."  ECF 327 at 4 (citation omitted).

In addition, defendant was obese, with a BMI of 36.  *Id.* at 3.  And, defense counsel referenced defendant's "history of extensive smoking" and defendant's sleep apnea, along with "uncontrolled" high blood pressure, registering as high as 220/110.  *Id.*

Prior to commencing incarceration, defendant also developed a condition known as "normal pressure hydrocephalus."  ECF 360-1.  That diagnosis was based on an MRI scan of defendant's brain on January 5, 2021.  *Id.*

Defendant's BOP medical records also reflect numerous health conditions, some of which have been mentioned.  Of particular import, in April 2024 defendant was diagnosed with "'squamous cell carcinoma of the right tongue'. . . ."  ECF 458 at 1 (citation omitted); *see* ECF 422; ECF 433-1.  In particular, the BOP records reflect that on April 18, 2024, while defendant was at FCI Loretto, he was evaluated for a "right neck mass" that had persisted "for several months."  Exhibit 7 at 784.  Defendant underwent a laryngoscopy on May 6, 2024, and a biopsy established "invasive squamous cell carcinoma."  *Id.* at 753.  Kim Swindell, M.D., the Clinical

Director at FCI Loretto, stated that defendant "requires urgent PET CT imaging, urgent oncology referral, and urgent initiation of radiation therapy . . . ." *Id.*

By the time of defendant's diagnosis in April 2024, the cancer had metastasized to defendant's lymph nodes. ECF 437; ECF 458-1 at 2; ECF 464 at 8. The BOP medical records state, for example: "History of Stage IVB Squamous Cell Carcinoma Oropharynx/Vallecula." ECF 464 at 8; *see also*, *e.g.*, Exhibit 8 at 22, 131. The records also reflect that the cancer "spread to lymph nodes in both sides of the neck." ECF 458-1 at 3.

In a pro se submission of April 22, 2024 (ECF 422), Mr. Stavrakis advised the Court that he was diagnosed with throat cancer on April 19, 2024. He claimed that the diagnosis was made eleven months *after* he went to health services to discuss, in part, a "large growth on [his] neck." *Id.* According to the defendant, his medical condition had "been ignored and left untreated for almost one year . . . ." *Id.* Stavrakis asserted, *id.*: "About eleven months ago I made an appointment with Health Services . . . . During that appointment I showed PA Hoover the large growth on my neck." *Id.* He described the growth at that time as "slightly smaller than a golf ball." *Id.* Defendant added, *id.*: "I explain[ed] to [Hoover] that I've had it for a couple of months, and that it was not getting better." Hoover recognized that defendant's lymph nodes were swollen and allegedly said: "'We will keep an eye on it.'" *Id.* When defendant asked if it should be evaluated, Hoover supposedly answered: "'[T]here is nothing to look into.'" *Id.* And, according to defendant, Hoover also said: "'We don't go looking around for bad things.'" *Id.*

Further, defendant complained that he did not see Dr. Swindell until March 2024. *Id.* at 2. Dr. Swindell promptly made arrangements for a CT scan. *Id.* Nonetheless, defendant maintained that he received inadequate medical care because of the lengthy delay that he had experienced in regard to his cancer diagnosis. *Id.* at 3. In defendant's view, PA Hoover "acted with deliberate

indifference of and reckless disregard for [his] medical needs . . . ." *Id.* at 4.  Further, he claimed that Hoover "failed in her duty of care" by "ignoring these signs and not informing Dr. Swindell . . . ." *Id.*  Defendant also claimed that the BOP was negligent in failing "to timely diagnose and treat the cancer of [his] throat and lymphatic system in violation of its standard of care." *Id.*  He posits that the one-year delay in treatment "allowed this cancer to grow . . . ." *Id.*

Defendant provided the Court with medical records as they became available.  *See*, *e.g.*, ECF 424, ECF 424-1.  A report of April 2, 2024, indicates the presence of a lump on defendant's neck "for a few months."  ECF 424-1 at 2.  But, according to defendant, by that point the BOP had actually known of the lump for some thirteen months.  *Id.*; *see also* ECF 424.

Stavrakis also submitted to the Court the medical report of Robert Caughey, dated May 22, 2024, for services provided at "Ear, Nose and Throat Associates of Central PA, PC."  ECF 433-1.[24]  It is also signed by Dr. Swindell, presumably to show that she reviewed it.  *Id.* at 1.  The report reflects a diagnosis of "Malignant neoplasm of base of tongue," *id.* at 2, with a staging of "Stage 3."  *Id.* at 3 (T3N3 scca left oropharynx/vallecular).  It also states that defendant requires a "full course of radiation therapy (35 treatments). . . ."  Notably, it provides, *id.*:  "Given location and potential for airway compromise will need to move quickly. . . . Given complexity of treatment and need for frequent visits *compassionate release from prison should be considered*."  (Emphasis added).

Defendant submitted a request to the BOP for compassionate release, dated May 21, 2024.  ECF 435.  He supported his request with a report of Dr. Swindell.  *See id.* at 3.  She stated that, as of May 30, 2024, defendant, then 58 years of age, was "noted to have a right-sided neck mass" at a "Chronic Care Clinic evaluation" on March 15, 2024.  She also indicated that she reviewed

---

[24] Caughey is not identified as a physician.  But, presumably he is a doctor.

defendant's CT imaging of April 2, 2024, and his laryngoscopy of May 6, 2024. *Id.* Dr. Swindell reported that defendant had "T3N3 HPV-associated invasive squamous cell carcinoma of Loropharynx including the vallecula . . . ." *Id.* Notably, she indicated that Stavrakis required "urgent PET CT imaging, urgent oncology referral, and urgent initiation of radiation therapy . . . ." *Id.* And, she provided defendant's past medical history, to include, *inter alia*, hypertension and peripheral vascular disease, including atherosclerosis of the aorta. *Id.* Of import, after addressing defendant's prognosis, Dr. Swindell said, *id.*: "To this end I support the submission of the RIS [*i.e.*, reduction in sentence]."

Kiran Naqui, M.D. wrote to the Court by letter dated May 24, 2024. ECF 437. Dr. Naqui is a board certified hematologist and oncologist who completed a fellowship at M.D. Anderson Cancer Center and Baylor College of Medicine in Houston. *Id.* at 1. Dr. Naqui is also an Associate Clinical Professor in Hematology and Oncology at the University of California, Irvine. *Id.* At the time, based on the doctor's review of defendant's pre-treatment medical records, the doctor described defendant's condition as "severe and life-threatening, requiring immediate and comprehensive treatment . . .'', particularly because of "the significant delay" in diagnosis and treatment. *Id.* Dr. Naqui opined: "The prolonged and unexplained delays in addressing [defendant's] symptoms and the failure to follow up on significant clinical findings are indicative of a standard of care that falls below what is required for such a serious condition." *Id.* at 3.

On May 30, 2024, Dr. Swindell approved defendant for redesignation to a federal medical center. ECF 435 at 3. Defendant was transferred to FMC Butner in June 2024 for "intensive treatment of his cancer diagnosis." ECF 466 at 2.

Stavrakis underwent a "PET-CT" scan on June 18, 2024.  Government Exhibit 7 at 746.  It revealed, *inter alia*, "A large hypermetabolic mass" and "multiple metastatic nodes in the right neck."  *Id.*  The scan also revealed coronary artery atherosclerosis.  *Id.*

Stavrakis began chemotherapy on July 1, 2024.  *Id.* at 279.  And, on July 8, 2024, he began a course of both radiation and chemotherapy.  *Id.* at 270.  As mentioned, defendant completed his cancer treatment on September 20, 2024.  ECF 464 at 5; ECF 468; Exhibit 8 at 163.

Defendant underwent a cardiac catherization at Duke University Hospital on December 20, 2024.  Exhibit 7 at 512.  Although defendant had previously had an abnormal stress test, the catherization showed only "mild athero-10%, 20%."  *Id.*

On February 10, 2025, defendant underwent another PET/CT Scan.  Government Exhibit 8 at 146.  However, it was not "a diagnostic quality CT examination . . . ."  *Id.*  Nonetheless, the imaging showed "Dramatic involution of tumor mass at base of tongue . . . since prior exam in 06/2024."  *Id.* at 147.  The report also indicates that there was no evidence of "distant metastatic disease within the chest, abdomen, or pelvis."  *Id.*  But, the report stated, *id.*: "There is a very small focus of mildly abnormal FDG activity right posterolateral tongue near the superior margin of the previously documented tumor.  The possibility of a small focus of residual or recurrent tumor at this location is not excluded."

In addition, the report stated, *id.* at 146:  "There are extensive atheroscleotic coronary artery calcifications.  Ascending aorta is dilated. . . .  Severe aortoiliac atherosclerotic calcifications are present without aneurysmal dilation."  Further, the study revealed a small lesion on the liver, believed to be benign, and, since June 2024, a new, mild compression at L1 that appears "chronic . . . ."  *Id.*

40

Defendant had a follow up examination on May 16, 2025.  The medical record for that exam reflects a description of the PET/CT of February 2025, as follows:  "Excellent response."  Government Exhibit 8 at 19.[25]

On March 12, 2025, another PET scan was ordered for defendant.  It was to be performed by September 3, 2025.  *Id.* at 49; *see also id.* at 22 (stating, in note of 5/7/25, "Repeat PET in 4–6 months").

Defendant was seen by Ron Allison, M.D., on July 17, 2025.  Government Exhibit 8 at 134.  Dr. Allison stated that defendant "remains without evidence of disease."  *Id.*  Defendant was to be seen again in 90 days.  *Id.*  And, defendant was scheduled for an ENT evaluation at Duke University Hospital.  *Id.*

On August 26, 2025, defendant had a full body PET/CT scan.  *Id.* at 131.  Again, the CT images did "not constitute diagnostic quality . . . ."  *Id.*  The report indicates "complete resolution of the previously seen possible residual focus at the base of the tongue . . . ."  *Id.*  However, the images showed a "mildly ectatic ascending aorta" and "[p]hysiologic activity . . . involving the myocardium, but now also the anterior wall of the right ventricle . . . ."  *Id.*

Stavrakis was transferred to FCI Butner Low in May 2025, after successful treatment of his cancer.  ECF 466.  He is currently prescribed medication for "Malignant neoplasm of head, face and neck."  ECF 468 at 2.  The BOP medical records contain various other descriptions of defendant's cancer.  *See*, *e.g.*, ECF 468 (BOP Health Services report of 7/17/25, describing the diagnosis as "advanced Base of tongue head and neck cancer with fixed nodes"); Government Exhibit 8 at 163 (describing the condition as "advanced squamous cell cancer of the base of

---

[25] Although I cite to page 19, I note that page 19 is omitted from the hard copy of the exhibit.  I determined that the text in issue appears on page 19 because the page is two-sided and page 20 is on the other side.  However, pages 17 and 18 were also omitted.

tongue. . . ."); Government Exhibit 7 at 749 (consultation note of 6/14/24, recounting defendant's "one-year history of progressing fullness in the right mid neck"; describing CT Scan of 4/2/24, showing, *inter alia*, "pathologically enlarged right level two and three lymphadenopathy"; laryngoscopy in May 2024, reporting "abnormality of the base of tongue, right tonsil and vallecula . . . ."; and "Right Vallecular biopsy returned HPV-positive invasive squamous cell cancer").

As a result of defendant's cancer treatment, defendant has experienced substantial weight loss. Among other issues, defendant experiences difficulty in eating because of swallowing problems. *See*, *e.g.*, ECF 464 at 39-40; but *see id.* at 37. The BOP medical records for May 7, 2025, reflect that defendant requires nutritional supplements. ECF 464 at 8.

On May 22, 2024, about a month after the defendant's cancer diagnosis, defendant weighed 285 pounds and had a BMI of 35.62. ECF 433-1. He weighed 198.2 pounds a year later, on May 29, 2025. ECF 464 at 2. Nevertheless, the government disputes defendant's contention that he is suffering from "severe malnutrition." ECF 466 at 1. It points to ECF 464 at 1, a report of May 29, 2025, asserting that defendant is "technically" overweight. *Id.* However, the record shows defendant's weight of 198.2 pounds, *id.* at 2, and a BMI of 24.8. *Id.* at 1. This does not indicate that defendant is overweight. *See* ECF 464 at 1. In addition, a medical note of August 19, 2025, indicates "abnormal weight loss." Exhibit 8 at 4. But, it also reflects that defendant's weight increased by 12.1% in the past six months. *Id.* Defendant weighed 219.8 pounds on that date. *Id.*

Defendant has submitted the declarations of two physicians with impressive credentials. They are Eric Ojerholm, M.D. and Rebecca Lekim, D.O. Both reviewed defendant's medical records, but neither physician had an opportunity to examine the defendant.

42

Dr. Ojerholm's Declaration is dated March 28, 2025.  *See* ECF 458-1.  He has been Board Certified in radiation oncology since 2018.  Dr. Ojerholm graduated summa cum laude from Duke University, with a degree in Biomedical Engineering.  He earned his medical degree in 2012 from the University of Pennsylvania, where he was inducted into the *Alpha Omega Alpha Honor Society*.  He is currently an active clinician as well as an Associate Professor of Clinical Radiation Oncology at the University of Pennsylvania.  He has significant experience with regard to head and neck cancers.  *Id.* at 1.

Based on Dr. Ojerholm's review of defendant's medical records, he opines that the defendant had a squamous cell carcinoma of the oropharynx, *i.e.*, a cancer in the back of the throat, caused by a virus.  *Id.* at 3.  He described the cancer as "locally advanced."  *Id.*  He believes it was Stage II.  *Id.*[26]

Defendant was treated with chemotherapy and radiation, "within the standard of care with the goal of cure."  *Id.*  Dr. Ojerholm asserts, *id.*:  "The scans shows one area of possible concern that should prompt further investigation — but if this area is confirmed not to be cancer, then Mr. Stavrakis is most likely cured from his tumor."  *Id.*  However, the Declaration was prepared prior to the latest PET/CT Scan for defendant.

Dr. Ojerholm avers that "[e]arly results seem promising," but he points out that the "cancer could return and [defendant] needs timely, comprehensive post-treatment surveillance care."  *Id.*  He adds that, during the next five years, "there is an approximately 20% risk that [defendant's] cancer could return.[]"  *Id.*  Therefore, Dr. Ojerholm maintains that defendant "will need to be monitored closely."  *Id.*  He explains:  "If a recurrence is caught early, it can sometimes be

---

[26] Other records indicate the cancer was Stage III (ECF 437) or Stage IVB (ECF 464 at 8), "with spread to lymph nodes in both sides of the neck."  ECF 458-1 at 2.

salvaged . . . .   However, if a recurrence is missed or noticed too late, [defendant] could lose this opportunity — with potentially fatal results." *Id.*

The Declaration of Dr. Ojerholm includes the post treatment surveillance care that he would utilize if Mr. Stavrakis were his patient outside of prison.  *See* ECF 458-1 at 3-4.  The comprehensive list of prophylactic measures includes nasopharyngolaryngoscopy procedure by a specialist every three months for the first two years, and then every six months for the next three years, and then annually.  ECF 458-1 at 4.  He also recommends CT scans of the neck and chest every three months for the first two years.  And, he recommends evaluation by a dental specialist every six months to reduce the risk of jawbone damage from treatment.   In addition, because radiation treatment can cause plaques, he recommends periodic ultrasounds of the carotid arteries. *Id.*  Dr. Ojerholm concludes, *id.*:  "If Mr. Stavrakis is not provided the surveillance care outlined above, the Court should consider this lack of appropriate treatment a significant factor in support of [defendant's] compassionate release."

Dr. Lekim's Declaration is dated June 5, 2025.  ECF 458-2.  She is a board certified physician specializing in Internal Medicine.  Dr. Lekim has practiced medicine since 2015 and cares for a wide variety of patients, including those in custodial settings.  *Id.* at 2.

According to Dr. Lekim, defendant's medical records reflect a history of "squamous cell carcinoma of the right tongue now in remission after chemoradiation."   *Id.*   She describes complications in defendant's treatment because of oral thrush and oral fungal infection as well as mucositis, "a painful inflammation of the mucous membranes lining the mouth and digestive tract."  *Id.*  Further, she avers that, as a result of the cancer treatment, as well as the treatment complications, defendant "has had significant weight loss and malnutrition due to inability to adequately consume the nutrition and calories required to maintain his body."  *Id.*

44

Among other things, Dr. Lekim asserts that defendant's malnutrition is "evidenced by an ongoing >20% weight loss with a weight of 260 lbs. 6/7/24 to a weight of 198 lbs. 3/21/25 . . . ." *Id.* at 3. She explains that the weight loss is due primarily to defendant's overall decrease in nutritional intake "as a result of pain related to swallowing and decreased salivary production as noted by the nutritionist on 3/10/25." *Id.*

In addition, Dr. Lekim opines that the defendant "has significant peripheral artery disease, which has not been comprehensively evaluated" by the Bureau of Prisons. *Id.* She also asserts that defendant has "coronary artery disease, hypertension, hyperlipidemia, gout, sciatica, and [a] history of left shoulder acromioclavicular separation requiring reconstruction." *Id.* She states, *id.* at 2–3: "In my medical opinion, due to Mr. Stavrakis's progressive ongoing malnutrition, overall deconditioning, and mobility limiting peripheral artery disease, it is unlikely that he could be a physical danger to society. Additionally, even assuming the good intentions of the BOP, managing Mr. Stavrakis['s] complex medical conditions in a custodial environment will be a significant challenge."

Dr. Lekim also points out that a CT angiogram was recommended to evaluate the left leg pain that defendant experiences due to a lack of adequate blood flow. Although recommended in November 2023, she claims that, as of the date of her Declaration, June 5, 2025, it had not been performed. If the defendant were to progress to severe disease with inadequate blood flow to distal extremities, she states that complications could lead to amputation. *Id.* at 4.

The government has submitted hundreds of pages of defendant's BOP medical records. And, the government maintains that the BOP is quite able to provide adequate medical care to the defendant, as indicated by his successful cancer treatment. But, of significance the government

did not submit any expert opinions that refute the assertions of either Dr. Ojerholm or Dr. Lekim, outlined above.

Additional facts are included, *infra*.

## V.    Discussion

### A.

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), defendant seeks a reduced sentence "based on a combination of 1) his debilitating and complex medical conditions . . . .; 2) the BOP's inability to effectively manage his complex medical care; and 3) his post-sentencing rehabilitative conduct." ECF 458 at 2. Further, he contends that a reduction of sentence is appropriate in light of the factors under 18 U.S.C. § 3553(a). *Id.*

In support of the Motion, defendant relies on U.S.S.G. § 1B1.13(b)(5), the "catchall" provision. ECF 458 at 9. The defendant also points to the recommendations of Dr. Ojerholm, Dr. Lekim, and Dr. Collector, the defendant's primary care physician at the time of his incarceration, who wrote to the Court on several occasions concerning defendant's medical issues, and in support of defendant's request to postpone his surrender dates. *See*, *e.g.*, ECF 342-1, ECF 353-2, ECF 360-1, ECF 365.

Of import, the defendant does not request immediate release from prison. Nor does he request a particular sentence reduction. ECF 470 at 8. Rather, he asks the Court to reduce the sentence "to a term that the Court deems 'sufficient, but not greater than necessary' . . . ." *Id.*

Defendant posits that the BOP has a "documented inability to meet [defendant's] specialized healthcare needs," which he maintains "constitutes an extraordinary and compelling reason supporting compassionate release." ECF 458 at 13. Indeed, in defendant's view, the BOP "is structurally incapable of meeting" defendant's need for "multidisciplinary care from

46

specialists . . . ."  *Id.* at 14.  He cites the report of the United States Department of Justice, Office of the Inspector General, issued in May 2024.  *See* U.S. Dept. of Justice, Office of the Inspector Gen., *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan* (May 2024) ("2024 OIG report' herein), available at https://oig.justice.gov/sites/default/files/reports/24-070U0.pdf.

Defendant asserts, ECF 458 at 15:  "For a patient like Mr. Stavrakis—whose care hinges on proactive monitoring, specialized treatment, early intervention and preventative care . . . this institutional blind spot is life-threatening."  ECF 458 at 15.  Defendant adds that "the BOP's own watchdog has confirmed that the Bureau cannot reliably deliver even baseline care."  *Id.* at 16.

Stavrakis acknowledges that his offense of conviction is "unquestionably serious."  *Id.* at 17.  But, he points out that "it involved no personal injury and occurred in the context of financial and professional duress."  *Id.*  Moreover, he notes that he is a "first-time offender," and he cites his personal history, which he claims "reveals a pattern of generosity, civic commitment, and familial responsibility . . . ."  *Id.* at 17-18.

In addition, defendant observes that he has not incurred any disciplinary infractions during his entire time in custody.  And, he has completed four educational courses, notwithstanding his ineligibility for credits under the First Step Act.  *Id.* at 16.  Moreover, until defendant's transfer to FMC Butner, he served on a BOP construction crew beginning in 2022.  *Id.*  Defendant posits, *id.* at 16:  "These rehabilitative efforts reflect Mr. Stavrakis's strong character, work ethic, and demonstrate a genuine commitment to leading a lawful and productive life after incarceration."

The government urges the Court to deny the Motion, claiming that defendant has failed to demonstrate "extraordinary and compelling" reasons for a reduced sentence.  ECF 462 at 8.  In

addition, the government contends that defendant "has failed to establish that the § 3553(a) factors weigh in favor of a reduced sentence." *Id.*

In support of the government's position, the government observes that the BOP, at FMC Butner, has "successfully treated the defendant's cancer into remission and continues to provide effective care in response to his other medical needs . . . ." *Id.* at 1. It adds, *id.* at 10: "The BOP caught, diagnosed, treated, and cured the defendant's cancer." Claiming that defendant's cancer "is not terminal," in that defendant is now "in remission," the government contends that defendant fails to establish an extraordinary and compelling reason for release. *Id.* at 9.

Moreover, the government claims that the defendant receives "regular, and adequate care from the BOP." *Id.* The government also argues that defendant's "allegations that the BOP has not or cannot provide adequate care for his condition are patently false as demonstrated by their life saving efforts." *Id.* at 10.

In the government's view, defendant's concern about a recurrence of cancer "is speculative at best." *Id.* In addition, the government insists that the defendant is receiving necessary and adequate medical care for all of his other health conditions, as reflected in the medical records. *Id.* at 10-14. For example, the BOP is treating defendant's peripheral vascular disease, for which he had two ultrasounds, was evaluated by a vascular surgeon, and had an MRI. *Id.* at 12–13. The government also points out that the OIG report cited by defendant concerns FCI Sheridan in Oregon, not FMC Butner. *Id.* at 14. It notes that there is no evidence that the defendant's medical care has been affected by a shortage of staff. *Id.*

Further, the government maintains that the sentencing factors codified in 18 U.S.C. § 3553(a) "militate" against a modification of the defendant's sentence. *Id.* at 16. In this regard, it points to the very serious nature of the offense, *id.* at 18, and notes that defendant has only served

four years of "his legislatively determined 15-year sentence" (*id.* at 1), which is less than 30% of his total sentence. *Id.* at 19. In the government's view, "a drastic modification" of the sentence would not provide just punishment or promote respect for the law. *Id.* at 1-2. In any event, the government points out that rehabilitation alone does not justify compassionate release. *Id.* at 15-16.

Defendant maintains that he was subjected to undue delay of about one year in the diagnosis of his cancer and this delay, in turn, delayed his treatment. The government does not appear to dispute the delay. Instead, it focuses on the end result. In effect, the government seems to suggest that "all's well that ends well." If the defendant's factual assertions are accurate, however, the BOP's delay in addressing defendant's complaint concerning the lump on his neck is troubling.[27] That said, once the cancer diagnosis was made, the medical records reflect that the BOP moved expeditiously to provide necessary and appropriate medical care. Fortunately, the defendant's cancer is now in remission.

However, Dr. Ojerholm has made clear that the remission is not the end of the matter. Rather, defendant requires "timely, comprehensive post-treatment care." ECF 458-1 at 3. And, he has outlined the ongoing, post-treatment care that he believes is essential for defendant's well being.

It is beyond dispute that appropriate follow up care is medically necessary for defendant because a recurrence of the cancer may occur and, if so, it must be caught sooner, not later, to avoid serious health consequences for defendant. However, I cannot determine from this record whether Dr. Ojerholm's list is an unrealistic "wish list," and one that most people would not

---

[27] On this record, I cannot make a determination as to the claim of undue delay. Defendant's assertions were not made under oath. Regardless, my resolution of the case does not require that I determine whether the diagnosis was unduly delayed.

actually receive.  Regardless, it is clear that careful monitoring of the defendant's health is essential.

In a status report of September 20, 2024 (ECF 451), counsel advised that defendant had completed his chemo-radiation treatment at FMC Butner.  But, the defense expert indicated that he could not opine on defendant's status until after a follow up PET scan.  *Id.*  And, a follow up PET Scan could not be done immediately after treatment, because that would affect its accuracy. *Id.*  Therefore, a PET scan was scheduled for January 12, 2025.  *Id.*  However, on January 17, 2025, the Court was advised that the BOP's PET Scan equipment was not operational.  ECF 452; *see also* ECF 453.  Initially, this raised a concern about the BOP's ability to monitor defendant's condition.  But, the delay was apparently brief; the scan was performed prior to March 28, 2025, when Dr. Ojerholm submitted his Declaration.

Based on the scan, Dr. Ojerholm opined that the PET/CT scan showed "one area of possible concern that should prompt further investigation . . . ."  ECF 458-1 at 3.  But, defendant had another scan in August 2025, after Dr. Ojerholm had already signed his Declaration.  It indicates that there is no longer an area of concern.  Government Exhibit 8 at 131.  Nevertheless, if the BOP fails in the future to provide necessary and adequate post-treatment monitoring for defendant's cancer, the Court expects that the defendant will inform the Court.

Of significance, defendant's cancer is not his only serious health issue.  On February 10, 2025, Dr. James Lester, Jr. noted that defendant has "Severe aortoiliac atheroscleotic calcifications . . . ."  ECF 464 at 127.  A cardiac catherization was recommended in November 2024.  *Id.* at 19.  Defendant had a cardiac catherization at Duke University Hospital on December 20, 2024.  Exhibit 7 at 1.  Thankfully, it did not reveal a serious issue.

The government seems to suggest that a defendant must be at death's door for a medical condition to qualify as an extraordinary and compelling reason for relief.  Numerous courts have found extraordinary and compelling medical reasons for compassionate release based on conditions that are no more serious or less serious than the defendant's current medical conditions.  To be sure COVID-19 may have been a factor in some of the rulings.  But, the fact remains that a defendant's medical issues can constitute an extraordinary and compelling reason for compassionate release.

For example, numerous courts have found extraordinary and compelling circumstances for defendants with chronic medical conditions such as diabetes and hypertension.  *See, e.g.*, *United States v. McDermott*, CCB-14-0334, 2021 WL 4804019, at *2 (D. Md. Oct. 14, 2021) (defendant with obesity, Hepatitis C, and other conditions); *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. Oaks*, RDB-17-288, 2020 WL 3433326, at *3 (D. Md. June 23, 2020) (defendant with Type II diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis); *United States v. Manzano*, 505 F. Supp. 3d 739, 743–47 (E.D. Mich. 2020) (diabetes and high blood pressure); *United States v. Fletcher*, TDC-05-0179-01, 2020 WL 3972142, at *3-4 (D. Md. July 13, 2020) (Type II diabetes and hypertension); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason);

*United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020) (finding defendant's hypertension and diabetes qualified as extraordinary and compelling reason); *see United States v. Heyward*, PWG-17-527, 2020 WL 3547018 (D. Md. June 30, 2020) (defendant was 65 years old and suffered from a "myriad [of] health conditions," including hypertension, chronic viral Hepatitis C, and peripheral vascular disease); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (obesity); *United States v. White*, 13-cr-20653-1, 2020 WL 2557077, at *5 (E.D. Mich. May 20, 2020) (hypertension and obesity); *see also United States v. Stephenson*, 461 F. Supp. 3d 864, 872 (S.D. Iowa 2020) (granting compassionate release to defendant who suffered from Hepatitis C even though government argued defendant was cured); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 42.3); *United States v. Ludwig*, KJM-14-cr-0043, 2020 WL 4547347, at *4 (E.D. Ca. Aug. 6, 2020) (finding defendant with Hepatitis B and C was at increased risk of suffering serious consequences from COVID-19 even though government argued defendant's conditions were in remission); *United States v. Head*, 2:08-cr-00093-KJM-2, 2020 WL 3180149 (E.D. Cal. June 15, 2020) (finding defendant's chronic asthma presented an extraordinary and compelling reason for compassionate release); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (obese defendant with a BMI of 32.5); *United States v. Conner*, No. CR07-4095-LTS, 2020 WL 3053368, at *1 (N.D. Iowa June 8, 2020) (granting motion for

compassionate release by petitioner with ongoing COPD and Hepatitis B and C diagnosis); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on defendant's obesity).

I am readily satisfied that defendant has established an extraordinary and compelling reason for a reduced sentence, based on his varied and serious health conditions. My view is grounded in U.S.S.G. § 1B1.13(b)(5) and § 1B1.13(b)(1)(B).

**B.**

Even if a defendant has established an "extraordinary and compelling reason" for relief, this does not end the inquiry. The Court must also consider whether the sentencing factors under 18 U.S.C. § 3553(a) warrant a sentence reduction. *See Brown*, 78 F.4th at 128; 18 U.S.C. § 3582(c)(1)(A).

The applicable factors in § 3553(a) include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Defendant was born in November of 1965. ECF 257 at 3. He will soon turn 60 years of age. "Recent analysis from the Bureau of Justice Statistics considering the recidivism rates of released prisoners in 30 states (including [Maryland]) from 2005 to 2010 supported the Commission's conclusion, finding decreased recidivism rates as prisoners age.[ ]" *United States v. Payton*, 754 F.3d 375, 377 (6th Cir. 2014) (emphasis added); United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010* (April 2014), at 12, https://perma.cc/ZE9K-QD9U; *see*

*also United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014) ("[S]tudies demonstrate that the risk of recidivism is inversely related to an inmate's age."). Those aged 40 years or older seem to have the lowest recidivism rates. *See Recidivism of Prisoners Released in 30 States in 2005*, *supra*, at 12, https://perma.cc/ZE9K-QD9U.

Moreover, district courts in the Fourth Circuit have considered a defendant's age as it relates to recidivism when balancing the § 3553(a) factors in regard to a motion for compassionate release. *See, e.g.*, *United States v. Hill*, 2023 WL 35211, at *9 (E.D. Va. Jan. 4, 2023) (age 59); *United States v. Mills*, No. 2:97-CR-815-DCN-1, 2022 WL 206074, at *6 (D.S.C. Jan. 24, 2022) (age 57); *United States v. Epstein*, JKB-17-453, 2020 WL 4339325, at *2 (D. Md. July 28, 2020) (age 60). Defendant's age, standing alone, does not warrant compassionate release. But, defendant's age is a factor that weighs in his favor.

It is noteworthy that defendant has no prior criminal record. At trial, the government introduced substantial evidence that showed Adcor and defendant were experiencing severe financial difficulties at the time of the fire. In other words, the motive was economic hardship. As I see it, given defendant's age and his personal history, I do not think the defendant is likely to reoffend. Therefore, the need for a sentence to deter future crime by the defendant is not significant. *See* 18 U.S.C. § 3553(a)(2)(B) (the sentence should "afford adequate deterrence to criminal conduct"); *id.* at (a)(2)(C) (a sentence should "protect the public from further crimes of the defendant"). This weighs in defendant's favor.

In addition, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *see United States v. Martin*, 916 F.3d 389, 397 (4th Cir. 2019); *Kibble*, 992 F.3d at 334 n.3. Courts place significant

weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture" of a defendant's "'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). The court must "at least weigh the [defendant's] conduct in the years since the[] initial sentencing[]." *McDonald*, 986 F.3d at 412.

Rehabilitation efforts should be considered in regard to a motion for compassionate release. *See United States v. Lancaster*, 997 F.3d 171, 175 (2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410–12 (noting that on a motion to reduce sentence under the First Step Act, the district court must consider defendant's post-sentencing conduct); *Martin,* 916 F.3d at 397 (requiring an "individualized explanation" as to rehabilitative efforts); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct). However, "rehabilitation alone cannot constitute an extraordinary and compelling reason for release." *United States v. Davis*, No. 21-6960, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022).

Defendant argues that his rehabilitation supports a sentence reduction. To the extent that defendant contends that he has been rehabilitated, the Court notes that the defendant has been steadfast in maintaining his innocence, notwithstanding substantial evidence of his guilt.

In the United States of America, a defendant enjoys the protections of the Fifth Amendment to the Constitution, and cannot be compelled to confess to a crime. Defendant had the absolute right to proceed to trial and to put the government to its burden to prove guilt beyond a reasonable

doubt. The government readily met its burden; the evidence of defendant's criminal conduct was compelling, as the jury found. Thereafter, the Fourth Circuit upheld the convictions. ECF 395. The Supreme Court declined to hear the case. But, the defendant's right to remain silent does not evaporate after the appeals are exhausted.

After defendant was unsuccessful in his appeal to the Fourth Circuit, he, like countless other defendants, filed a petition for post conviction relief, under 28 U.S.C. § 2255. ECF 406. This, too, was his right. Of note, defendant challenged his convictions by asserting a somewhat staggering seventeen grounds for relief. These included multiple claims of judicial error, prosecutorial misconduct, ineffective assistance of trial and appellate counsel, and actual innocence. After this Court denied the petition (ECF 439, ECF 440, ECF 445), Mr. Stavrakis noted an appeal to the Fourth Circuit. ECF 442. The appeal is pending.

Defendant has challenged the allegations against him at every step, as he is entitled to do. And, there are many valid reasons why a defendant who proceeded to trial would choose not to acknowledge criminal culpability after trial. I also appreciate that a defendant serving a lengthy sentence would avail himself of every possible avenue for relief. But, failing to admit culpability is quite different from an affirmative attempt to challenge the convictions by asserting multiple (and, in my view, unfounded) grounds of error and misconduct, while also seeking compassionate release, and claiming, among other things, rehabilitation. Nevertheless, I will not base my ruling on defendant's failure to accept responsibility for the commission of crimes that he has consistently contested.

I turn to defendant's behavior while in BOP custody. This is considered an important indicator of whether a defendant remains a danger to the community. *See* 18 U.S.C.

§ 3582(c)(1)(A)(ii).  Stavrakis has no disciplinary record in the BOP.  And, when possible, he took educational courses and also worked.  This weighs in defendant's favor.

Nevertheless, the government implores the Court not to overlook the reality that defendant's crimes were extraordinarily serious.  There is no question that the arson was egregious, and defendant deserves to be punished by way of a period of incarceration.  But, the Court also recognizes that incarceration, which is warranted, is not the only form of punishment.

Defendant's incarceration in the midst of a global pandemic surely "increased the severity of the sentence beyond what was originally anticipated . . . ."  *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, 456 F. Supp. 3d 557, 563 (S.D.N.Y. 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

It is equally obvious that the severity of defendant's sentence was exacerbated because he had to contend with a life threatening and frightening illness while in prison, without the support of family or the comforts of home, and without the ability to arrange for his own medical care.  For example, according to defendant, the BOP ignored the lump on his neck for months.  In his view, the delay allowed the cancer to spread.  And, even when the cancer was finally diagnosed, defendant could not determine for himself who would treat him, where he would be treated, or when he would be treated.

Moreover, defendant's tarnished reputation is part of his punishment.  Mr. Stavrakis had been a shining example of the American dream.  As a hard working, devoted son of immigrants, he transformed his father's machine shop into a highly successful business and he was heralded in his community for his success.  The outpouring of support for him at sentencing reflected the high esteem that defendant enjoyed.  Letters to the Court and statements of witnesses described

defendant as generous, humble, considerate, kind, a role model, and a mentor. They also attested to the defendant's devotion to his family, his philanthropy, his unfailing work ethic, as well as his commitment to his faith and his community. Without question, defendant plummeted from grace as a result of his prosecution and convictions. There is an irreparable stain on his reputation.

The three-year period of supervised release that follows defendant's incarceration also cannot be ignored. *See* ECF 255; ECF 258. If defendant were to violate the terms of supervised release, he can be subjected to further incarceration.

In addition, as part of defendant's punishment, the Court required defendant to pay full restitution. And, the Court ordered forfeiture of defendant's property. ECF 380. Defendant did not profit from his criminal conduct.

Next, I turn to consider the mandatory minimum sentence that the Court was required to impose. It cannot go unsaid that the case was charged by the government in such a way as to guarantee that, if convicted, the Court would have to sentence the defendant to at least a fifteen year term of imprisonment. This is because the government pursued two distinct but nonetheless related and overlapping arson offenses. One is codified at § 844(h)(1) (use of fire to commit a federal felony, *i.e.*, wire fraud), and the other is found at § 844(i) (malicious destruction of real property by fire). In addition, the government charged two counts of wire fraud under 18 U.S.C. § 1343. Each arson offense carries a mandatory minimum term of imprisonment, amounting to a required minimum of fifteen years of imprisonment. As discussed, *infra*, my limited review of arson cases in this District does not reveal that this practice is typical.

I thought at sentencing, as I think now, that a sentence of fifteen years of imprisonment is unduly harsh under the facts and circumstances attendant here. But, the exercise of any judicial discretion here was entirely foreclosed by statute and by the government's decision to charge two

arson offenses for one arson.  Notably, defendant's 15-year sentence far exceeds the national mean and median for arson cases for the years 2019 to 2024.

For Fiscal Year 2024, the U.S. Sentencing Commission reports that, for the crime of "ARSON" the "Mean" sentence nationally was 66 months out of 84 cases that were resolved by plea or trial.  The "Median" sentence nationally was 60 months.  There are no statistics for the Fourth Circuit for that year.  *See Table 7, "Sentence Length by Type of Crime," at 11, Statistical Information Packet, Fiscal Year 2024, Fourth Circuit*, U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, https://perma.cc/F267-5LA9.

For Fiscal Year 2023, the Mean sentence in the Fourth Circuit for arson was 71 months for nine cases.  The Median sentence was 60 months.  Nationally, out of 106 arson cases, the Mean sentence was 58 months and the Median sentence was 57 months.  *See Table 7, "Sentence Length by Type of Crime," at 11, Statistical Information Packet, Fiscal Year 2023, Fourth Circuit*, U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, https://perma.cc/AH8J-98K6.

With respect to Fiscal Year 2022, out of 106 arson cases nationally, the Mean sentence for arson was 45 months and the Median sentence was 42 months.  There were eight arson cases in the Fourth Circuit, with a Mean sentence of 48 months and a Median sentence of 34 months.  *See Table 7, "Sentence Length by Type of Crime," at 11, Statistical Information Packet, Fiscal Year 2022, Fourth Circuit*, U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, https://perma.cc/X54Q-JXBQ.

As to Fiscal Year 2021, of the 79 arson cases nationally, the Mean sentence was 63 months and the Median sentence was 48 months.  In the Fourth Circuit, six arson cases were adjudicated, with a Mean sentence of 37 months and a Median sentence of 30 months.  *See Table 7, "Sentence Length by Type of Crime," at 11, Statistical Information Packet, Fiscal Year 2021, Fourth Circuit*, U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, https://perma.cc/GC4A-B97S.

For Fiscal Year 2020, out of 48 arson cases nationally, the Mean sentence was 78 months and the Median sentence was 60 months. There were six arson cases in the Fourth Circuit, with a Mean sentence of 79 months and a Median sentence of 65 months. *See Table 7, "Sentence Length by Type of Crime,"* at 11, *Statistical Information Packet, Fiscal Year 2020, Fourth Circuit*, U.S. SENT'G COMM'N, https://perma.cc/6V9B-KD4B.

With regard to Fiscal Year 2019, there were 68 arson cases nationally. Of those cases, the Mean sentence was 76 months and the Median sentence was 60 months. There were three arson cases in the Fourth Circuit, with a Mean sentence of 288 months and a Median sentence of 240 months. *See Table 7, "Sentence Length by Type of Crime,"* at 11, *Statistical Information Packet, Fiscal Year 2019, Fourth Circuit*, U.S. SENT'G COMM'N, https://perma.cc/8BLG-5PC5.

It appears that the bloated 2019 Fourth Circuit Median and Mean for arson cases arose, in part, from a case adjudicated in the Eastern District of North Carolina. *See United States v. Elliot et al.*, TWB-16-00041 ("Elliot Case"), vacated, *United States v. Elliot*, 797 F. App'x 750 (4th Cir. 2019) (per curiam).[28]  The defendant, Elliot, was a real estate developer who had fallen on hard financial times. *Elliot*, 797 F. App'x at 751–52. In a desperate attempt to pay off his creditors, he

---

[28] The Elliott Case is one of the three arson cases in the Fourth Circuit in 2019 that resulted in the outlier mean and median for that year. But, the Court's research has not led to the identification of the other two cases.

The Court reached out to the Sentencing Commission in an effort to ascertain the names of the other two cases. On October 6, 2025, the Court was advised by email from an attorney for the Commission that the Commission keeps confidential the names of judges and defendants for all cases represented in its "data collection . . . ." The Commission's attorney confirmed, however, that there were three arson cases in 2019, and he also said that they "were outside the heartland of arson cases." The attorney related that in one of the cases, there were 23 counts of conviction. In another, the defendant was also convicted under 18 U.S.C. § 924(c)(1)(B), involving a machine gun or destructive device, which carried a mandatory minimum sentence of 30 years, consecutive to the arson. And, from the facts provided by the Commission's representative, it is clear that *Elliot* is the third case.

falsified a tax return to get a loan. *Id.* As Elliot's financial woes worsened, he obtained an insurance policy on one of his rental properties, worth nearly $500,000. *Id.* at 752. Elliot then conspired with his brother to set fire to the property to collect the insurance proceeds. *Id.* Elliot used Molotov cocktails and an accelerant to commit the arson, and he also set fire to three adjacent buildings in an effort to conceal his crime. *Id.* One of Elliot's tenants was in the building when it was set ablaze. *Id.* Although the tenant was not injured, the tenant sustained $1,700 worth of losses in personal property. *Id.* The fire also destroyed one of the adjacent buildings. *Id.*

Elliot was charged in nine counts, *id.*:

> [M]aking a false statement to influence a bank loan, in violation of 18 U.S.C. § 1014; wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit arson, in violation of 18 U.S.C. § 844(n); three counts of arson, in violation of 18 U.S.C. § 844(i); two counts of using or carrying a destructive device in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c); and aggravated arson, in violation of 18 U.S.C. § 844(h).

The case proceeded to trial. During trial, Elliot perjured himself numerous times in an attempt to shield himself and his brother from liability. Elliot Case, ECF 154 at 4. A jury convicted Elliot of making a false statement to influence a bank loan, but was unable to reach a verdict on the remaining charges. *Elliot*, 797 F. App'x at 752. To avoid a retrial, Elliot entered a plea of guilty to a single arson charge, in violation of 18 U.S.C. § 844(i), in exchange for dismissal of the remaining charges. *Id.*

Elliot had a Criminal History Category of I. Elliot Case, ECF 170 at 2. His presentence report assigned an adjusted offense level of 27, accounting for the defendant's false statement conviction and the fact that Elliot "knowingly created a substantial risk of death or serious bodily injury to another person[.]" *Elliot*, 797 F. App'x at 752. This produced a Guideline range of 70 to 87 months of imprisonment. *Id.* But, the government moved for an enhancement of one level, based on Elliot's leading role in the arson, *i.e.*, recruiting his brother to participate in the scheme.

*Id.* at 752–53.  The request was granted.  This resulted in a Guideline range of 78 to 97 months.

*Id.* at 753.

Additionally, the government asked the court for an upward departure for a sentence of 240

months of imprisonment.  *Id.*  The government identified five grounds, pursuant to U.S.S.G. §5K2,

*id.* at 752–53:

> (1) under U.S.S.G. § 5K2.5 to account for to[sic] the extent of property loss that
> Elliot caused, (2) under U.S.S.G. § 5K2.6 to account for the inherent danger to life
> and property caused by Elliot's use of Molotov cocktails, (3) under U.S.S.G. § 5K2.7
> to account for Elliot's justice-obstructing perjury, (4) under U.S.S.G. § 5K2.21 to
> account for Elliot's dismissed and uncharged conduct, and (5) under U.S.S.G. §
> 5K2.9 to account for the fact that Elliot committed arson in order to facilitate the
> additional offense of wire fraud.

Ultimately, the district court adopted the government's request "in full" and "sentenced

Elliot to 240 months' imprisonment, 143 months more than the final upper guidelines figure of 97

months." *Elliot*, 797 F. App'x at 753.  The court also ordered restitution of $926,541.89.  Elliot

Case, ECF 214 at 6.

The Fourth Circuit vacated Elliot's sentence and remanded for resentencing.  *Elliot*, 797 F.

App'x at 751.  It concluded that the sentence was "procedurally unreasonable because the district

court failed to articulate an aggravating circumstance justifying its upward departure." *Id.*  On

remand, the district court imposed a sentence of ten years.  Elliot Case, ECF 214 at 2.

A review of a handful of arson cases in this District is also informative.[29]  As with the data

from the Sentencing Commission, these cases suggest that defendant's sentence exceeds those of

other arson defendants.  And, under 18 U.S.C. § 3553(a)(6), the Court must consider "the need to

---

[29] Neither side presented the Court with any information about sentences in other arson
cases.  And, I do not suggest that my research was exhaustive.

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Luther Trent was charged with malicious destruction of property by fire, in violation of 18 U.S.C. § 844(i).  *See United States v. Trent*, ELH-22-0111.  The prosecutor in *Trent* was one of the prosecutors in this case.  Unlike Stavrakis, however, Trent pleaded guilty.  *Id.*, ECF 24, ECF 25.  Of import, Trent's Plea Agreement reflects that the object of his offense would have constituted first degree murder.  *Id.*, ECF 25, ¶ 6(b).  And, there were three potential murder victims, all of whom were occupants of the torched residence.  *Id.* ¶ 6(c); *see also id.* at 10–12.

Trent had a final offense level of 33 *after* deductions for acceptance of responsibility.  *Id.*, ECF 54 (Amended Presentence Report), ¶ 53.  Of course, Stavrakis did not earn deductions for acceptance of responsibility.  Trent, like Stavrakis had a Criminal History Category of I.  *Id.* ¶ 59.  Trent's Guidelines called for a sentence ranging from 135 to 168 months of incarceration.  *Id.* ¶ 79.  The government sought a sentence of 168 months (14 years).  *Id.*, ECF 31 at 1.  I imposed a sentence of 144 months of imprisonment (12 years) and ordered restitution of almost $613,000.  *Id.*, ECF 52.

Raymon Carter was charged with malicious destruction of a CVS pharmacy by arson, in violation of 18 U.S.C. § 844(i).  *See United States v. Carter*, ELH-15-0400, ECF 1.  The arson occurred in the context of riots and looting that erupted in Baltimore following the death of Freddie Gray while in police custody.  Notably, the defendant pleaded guilty to rioting, in violation of 18 U.S.C. § 2102(a), and not arson.  However, the overt act was the damage to property by fire.  *Id.*, ECF 8, ECF 10, ECF 12.

The plea was entered under Rule 11(c)(1)(C), by which the parties agreed to a sentence of 48 months of imprisonment.  ECF 12, ¶ 9.  Defendant had a final offense level of 21 and a criminal

history category of II.  *Id.*, ECF 15 (Presentence Report), ¶¶ 33, 40.  His Guidelines called for a sentence ranging from 41 to 51 months of imprisonment.  *Id.* ¶ 63.  The Court sentenced the defendant to the agreed term of 48 months of imprisonment and ordered restitution of $500,000. *Id.*, ECF 20, ECF 22.

Gregory Butler, Jr. was charged with obstruction of firefighters during a civil disorder under 18 U.S.C. § 231(a)(3), as well as arson, in violation of 18 U.S.C. § 844(i).  *See United States v. Butler*, JFM-15-0615, ECF 1.  As with *Carter*, the case concerned an arson at a CVS in Baltimore in the wake of rioting and looting that erupted after the death of Freddie Gray.  The defendant pleaded guilty to the obstruction offense.  *Id.*, ECF 55.[30]

Butler had a final offense level of 20.  ECF 61 (Presentence Report), ¶ 35.  With a criminal history category of I (*id.* ¶ 40), Butler's Guidelines called for a sentence of 33 to 41 months.  *Id.* ¶ 57.  In the government's sentencing memorandum (*id.*, ECF 67), the government asserted that defendant's conduct involved violence and "the risk to human life and property."  *Id.* at 1.  It sought a sentence of 33 months, which corresponded to the bottom of the Guidelines.  *Id.*

Judge J. Frederick Motz sentenced the defendant to time served and ordered restitution of $1,000,000.  *Id.*, ECF 81.  The Presentence Report (*id.*, ECF 61) indicates that defendant only spent about three weeks in pretrial custody.  *Id.* at 1. Judge Motz provided no grounds for the variance in the Statement of Reasons.  *See id.*, ECF 82.

*United States v. Darius Stewart*, RDB-15-0528, is another case rooted in the death of Freddie Gray.[31]  The defendant pleaded guilty to malicious destruction of property by fire, *i.e.*, a

---

[30] I could not locate the Plea Agreement on the Docket.

[31] The case was initially assigned to Judge Marvin Garbis.  It was reassigned to Judge Richard Bennett in September 2020, due to the retirement of Judge Garbis.  *See* Docket.

liquor store, in violation of 18 U.S.C. § 844(i).  *Id.*; ECF 15; ECF 31.  The prosecutor in *Stewart* was one of the prosecutors in this case.  The Plea Agreement (*id.*, ECF 32) provided for a base offense level of 24, because the offense created a substantial risk of death or serious injury and involved the destruction or attempted destruction of a place of public use.  *See id.*, ¶ 7(a) (citing U.S.S.G. § 2K1.4(a)(1)).

Notably, the defendant set a total of three fires.  *Id.,* ECF 39 (Amended Presentence Report), ¶¶ 11, 14.  Moreover, two people were inside the store at the time and both were seriously injured. *Id.* ¶¶ 12, 13.

The defendant was 21 years of age at the time of the offense.  *Id.* at 3.  The guilty plea was entered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 60 months (five years).  *See id.*, ECF 32, ¶ 14.  That corresponded to the mandatory minimum.  Judge Marvin Garbis imposed that sentence.  *Id.*, ECF 42.

Brian Swope, Jr. was charged with arson under 18 U.S.C. §844(i).  *See United States v. Swope*, ELH-13-0335, ECF 1.  He pleaded guilty to that offense on October 1, 2013.  *Id.*, ECF 24, ECF 25.  The factual stipulation indicated that defendant and another individual twice broke into a pizza restaurant, took money and other items from the store, used the money to buy drugs, sold some of the stolen items, and set the store on fire to cover up the burglary.  *Id.*, ECF 25 at 10-11. Defendant had a final offense level of 25.  *Id.*, ECF 31 (Presentence Report), ¶ 25.  And, he had a criminal history category of VI.  *Id.* ¶ 58.

Swope's Guidelines called for a sentence ranging from 110 to 137 months.  *Id.* ¶ 71.  Based on grounds for departure that are not applicable here, the Court sentenced defendant to a term of 70 months of imprisonment, with restitution of $100,347.44.  *Id.*, ECF 45.

I do not minimize the severity of the defendant's crimes here. But, only Mr. Trent received a sentence approaching that of the one imposed on Stavrakis. In *Trent*, the government sought a 14-year sentence because Trent purposely torched a residence occupied by several people, and his objective was murder. The Court imposed a 12-year sentence. Here, there was no evidence of any intent to injure anyone.[32] Indeed, the fire was clearly set at a time when no one would be inside the commercial building. Moreover, the government sought to prove that the arson here was motivated by economic hardship. In *Trent*, the motive was revenge. And, as discussed, Stavrakis was required to pay restitution, in full, to the insurance company. He was also subjected to forfeiture of property, as noted.

Simply put, the facts of the arson here do not stand out as so unusual as to merit a sentence so far in excess of the Mean or the Median for arson, as reflected in the Sentencing Commission records for the period 2019 through 2024. Nor is there an apparent basis for a sentence so at odds with the several reviewed earlier that were meted out in this District for arson.

Defendant has served approximately 56 months of incarceration, or almost one third of the sentence, exclusive of good conduct credit. Given the serious nature of the arson offense, and the fact that defendant has not yet served even one third of the mandated minimum sentence, a time-served sentence under 18 U.S.C. § 3582(c)(1)(A) is not appropriate. Indeed, as noted, defendant does not request immediate release. In my view, a reduction of the sentence to time served would undermine respect for the law.

However, the First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the

---

[32] The Court recognizes, of course, that the lives of firefighters are always at risk when fighting a fire.

appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Accordingly, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact.  The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts have granted sentence reductions without immediate release.  *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F. Supp. 3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Brooker*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer.  18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

## VI.    Conclusion

It is undisputed that, while defendant has been in prison, he developed invasive squamous cell carcinoma of the right tongue.  *See*, *e.g.*, government Exhibit 7 at 753, 784; ECF 458 at 1.  The record suggests a delay in diagnosis by the BOP.  But, once the cancer was diagnosed, the defendant was promptly transferred to FMC Butner, where he was successfully treated.

Fortunately, defendant is now in remission.  But, two medical experts have opined that defendant must be carefully monitored for possible relapse and for other conditions that may

develop due to his chemo/radiation treatment.  The government presented no outside experts.  Nor does it dispute defendant's need for ongoing medical care.  And, defendant has other serious health issues, discussed earlier.

As discussed, the way in which this case was charged required the Court to impose a sentence of at least fifteen years of imprisonment.  In particular, the government charged the defendant with two distinct but overlapping arson offenses for one arson:  use of fire to commit a federal felony, *i.e.*, wire fraud, in violation of 18 U.S.C. § 844(b)(1), and malicious destruction of property by fire, in violation of 18 U.S.C. § 844(i).  The government also charged two counts of wire fraud.  Each arson offense carries a mandatory minimum.  From my limited review of other arson cases, the government typically does not lodge two arson offenses for one incident.  And, the two arson offenses cannot be "grouped" for sentencing purposes.  In effect, the government's charging decision stripped the Court of any ability to impose a reasonable sentence.

Given the nature and circumstances of the defendant's offenses; defendant's serious medical conditions and the need for post-treatment monitoring and care; the defendant's personal history, including his lack of a prior criminal record and his lack of any BOP infractions; as well as a comparison between defendant's sentence and the sentences meted out in other arson cases in recent years, both nationally and in this District, a sentence reduction is warranted.  I shall reduce defendant's total sentence to 85 months of imprisonment.

A revised Judgment and Commitment shall issue.  An Order follows.


Date:   October 9, 2025                                    /s/_____
                                                          Ellen L. Hollander
                                                          United States District Judge